**EUA COGENEX CORPORATION,**
Plaintiff,

v.

**NORTH ROCKLAND CENTRAL SCHOOL DISTRICT,**
Defendant.

No. 99 Civ. 2372(CM).

United States District Court,
S.D. New York.

Dec. 20, 2000.

Carolyn Traister Schiff, McDermott, Will & Emery, New York, NY, Christopher W. Parker, McDermott, Will & Emery, Boston, MA, for EUA Cogenex Corp.

John J. Henry, Whiteman, Osterman & Hanna, Albany, NY, for North Rockland Cent. School Dist.

### MEMORANDUM DECISION AND ORDER GRANTING AND DENYING IN PART PLAINTIFF AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

EUA Cogenex ("EUA") asserts three causes of action against the North Rockland Central School District ("the District") arising from the District's failure to pay EUA under an energy savings performance contract: (1) breach of contract; (2) breach of an implied covenant of good faith and fair dealing; and (3) unjust enrichment. Plaintiff moves for summary judgment on those claims. Defendant cross moves for summary judgment on plaintiff's claims of breach of the covenant of good faith and fair dealing and unjust enrichment. Defendant counterclaims, alleging violation of N.Y.Gen.Bus.L. § 349, and plaintiff moves for summary judgment on that claim.

### PROCEDURAL HISTORY

At the outset of this litigation, the District moved to dismiss this action on the ground that EUA had not served a notice of claim as required by New York Education Law. EUA cross-moved for leave to file a late notice, pursuant to N.Y.Educ.L. § 3813(2–a). This Court granted such leave, and EUA served the required notice of claim.

■ The District now moves to dismiss the action, claiming that the notice of claim was defective because only state courts have jurisdiction to grant leave to serve a late notice. Defendant is incorrect.

The cases cited by the defendant all support the proposition that a federal court may not grant leave to serve a late

notice of claim for a tort action against a government entity under N.Y.Gen.Mun.L. § 50–e. *See Woods v. New York City Dept. of Sanitation,* 1999 WL 476305, 1999 U.S.Dist. Lexis 10231, *9 (S.D.N.Y.1999); *Roberts v. New York City Department of Corrections,* 1998 WL 391815, 1998 U.S.Dist. Lexis 8244 (S.D.N.Y.1998). That statute explicitly provides that "[a]ll applications ... shall be made to the supreme court or to the county court" where the action may be properly brought to trial, or where the action is pending. N.Y.Gen. Mun.L. § 50–e(7).

There is no such requirement for a contract action brought under the New York Education Law. This Court is empowered to grant leave to file a late notice of claim by Education Law § 3813(2–a). Unlike § 50–e of the General Municipal Law, the Education Law sets no jurisdictional requirements for applying for a late notice of claim. It simply states that "[u]pon application, the court, in its discretion, may extend the time to serve a notice of claim." N.Y.Educ.L. § 3813(2–a). If a formal application is made by a Plaintiff, as was done in this case, a federal court can give it proper consideration. *See Courtemanche v. Enlarged City Sch. Dist. of the City of Middletown,* 686 F.Supp. 1025, 1033 (S.D.N.Y.1988); *Hilow v. Rome City Sch. Dist.,* 1994 WL 328625, *7 (N.D.N.Y. June 29, 1994) ("a plaintiff who has not filed a timely notice of claim [under § 3813] may move to extend the time in which to serve such a notice"). While notices of claim for tort actions brought under § 3813 against a school district are to be governed by Section 50–e, similar applications for a contract action may be considered by a federal court. *See Courtemanche,* 686 F.Supp. at 1032–33.

Defendant's motion to dismiss is denied.

## FACTS PERTINENT TO THE MOTION

**1. Proposal For The Energy Services Lease Agreement**

EUA and the District signed an Energy Services Lease Agreement ("ESLA") as part of an energy conservation program sponsored by Orange and Rockland Utilities ("ORU") on August 28, 1991. The ESLA is an energy performance contract, under which a contractor such as EUA agrees to install and maintain energy savings equipment on the owner's premises and then is paid a portion of the energy savings in consideration for installation of the equipment. ORU hired EUA under a bidding program to install such equipment throughout Rockland County.

EUA undertook a review of the District's then-existing lighting fixtures and estimated the savings that the District would expect to receive based on EUA's installation of energy-saving equipment. Plaintiff then forwarded a proposal letter to the District, dated June 6, 1991, that summarized the savings that the District could expect to receive as a result of the contract. (Hammel Aff. at Exh. 10; Lennon Dep. at 50–53.) In the letter, EUA stated:

> The enclosed reflects installation of Demand Side Management measures which will reduce your electrical energy cost for installed lighting measures *by approximately $213,018 for the first year and representing a total over the fifteen years term of $2,117,394.* These savings are provided to you at no cost for installation of measures. EUA will pay for all engineering, design, installation, and supervision of work to be performed.

(Hammel Aff. at Exh. 10.) (emphasis added). The proposal letter was signed on the same day as the original ESLA and was incorporated by reference in the ESLA. The Proposal also offered a $30,000 "signing bonus" for the District for agreeing to the terms of ESLA. The ESLA was signed by William H. Sullivan, Assistant Superintendent of the District, and Arthur P. Lennon, Vice President of EUA.

The representations made in EUA's proposal letter to the District as to the dollar

amount of electrical cost savings were based upon EUA's calculations that installation of its energy saving lighting equipment would reduce the District's electrical demand by approximately 639 Kilowatts (KW) for all of the facilities covered by the contract, and concomitantly reduce the District's annual electrical consumption by 1,851,392 Kilowatt–Hours (KWH) based upon the District's hours of use. (Lennon Dep. at 59–60.)

The ESLA required Cogenex to install high efficiency lighting and other energy conservation measures (the "Equipment") at the Thiells Elementary School, Gerald Neary Elementary School, North Gernerville Elementary School, BOCES Elementary School, West Haverstraw Elementary School, Haverstraw Middle School Annex, Maintenance Building, North Rockland High School, Haverstraw Middle School, James A. Farley Middle School, and Tompkins Cove Warehouse. The ESLA provided that Cogenex would lease the Equipment to the Defendant for a fifteen-year term.

2. Savings and Measurement Terms Under ESLA

William Sullivan led all ESLA negotiations with EUA. Under the ESLA, the District and EUA agreed to the following two-part procedure to measure savings (the "Measurement Terms"):

(a) Prior to installing the Equipment, [EUA] would determine the energy demand, measured in kilowatts ("kw"), of the Premises' existing lighting system.

(b) After the Equipment was installed, [EUA] would determine the Premises' post-installment energy demand for the lighting system, again measured in kw. By comparing this figure to the pre-installation kw demand, [EUA] would determine the reduction in kw resulting from the Equipment.

(Hammel Aff. Exh. 2 (ESLA, Append.II.))

EUA performed a room by room survey of lighting fixtures before and after the installation of the Equipment. The survey included the type and number of lighting fixtures, and tested a sample of each type of fixture with a wattmeter to determine average energy demand required by each fixture type. To determine total kilowatt demand, EUA multiplied the average kilowatt demand for each type of fixture, as measured by a sampling process, by the total number of fixtures of that type. (Id.) EUA then added the total kilowatt demand determined through this process for each type of fixture to determine the total energy demand for lighting equipment. (Id.)

EUA discussed the ESLA Measurement terms with the District both before the ESLA was signed and again before significant work pertaining to the ESLA was performed. (ESLA; Lennon Dep. at 55, 58, 79.) The parties agreed to the ESLA Measurement terms by signing Appendix II. (ESLA Append. II; Hammel Aff. at Exh. 4 (Sullivan Dep.) at 43.)

The ESLA also provided terms for the District's payment obligation. The District's payments were to equal a percentage of energy cost savings attributable to the Equipment, as measured by the method described in ESLA. It provided that "[t]he amount of payment made by [the District] for energy savings shall be equal to 0% for year 1, 60% for years 2 through 4, 55% for years 5 through 10 and 50% for years 11 through 15 of the savings as shown on the ECR each month for a term of 15 years." (Id.) To determine energy cost savings effected by the Equipment, the parties agreed that they would multiply the kilowatt and kilowatt hour reduction determined in the manner agreed to in the ESLA by ORU's published kilowatt and kilowatt hour charges. (Id. at Append. II, subpart d.) The ESLA also provided that if the District failed to operate its lighting system for at least 95% of the hours set forth in the Proposal, Cogenex could invoice the District as if the District

were in fact operating at full capacity, notwithstanding the lower hours of operation, to preserve EUA's income level from the project.

### 3. Post–Installation Audits

After execution of the ESLA, EUA began installation of the energy saving lighting at the District's premises. According to EUA, post-installation audits performed by EUA confirmed that kilowatt savings attributable to the Equipment was 905.23 kilowatts, an amount higher than the 639 kilowatts which was estimated in the Proposal. (Aronson Aff. at Exh. 8.) Plaintiff alleges that these audits were confirmed by ORU. Defendant disputes that fact, claiming that the verification was done by ANC Enercom, a contractor unaffiliated with ORU. (Hammel Aff. at Exh. 1 (Thorpe Dep.) at 128.).

By letters dated May 18, 1992, August 12, 1992 and October 2, 1992, ORU informed EUA that it approved all of EUA's post-installation reports. (Hammel Aff. at Exh. 12.) As approved by the ORU-sponsored energy conservation program of which ESLA was a part, ORU paid EUA installments of $196,622.73, $119,121.04 and $37,415.79 for achieving the verified kilowatt reduction. (Hammel Aff. at Exh. 13; Thorpe Dep. at 85.)

The term of the ESLA began in March 1992 upon certification that the installation of the Equipment was "substantially complete." In accordance with the ESLA, no payment was due from the District for the one-year period after installation of the equipment—March 1992 to March 1993. (ESLA, Hammel Aff. at Exh. 2.) In March 1993, EUA began invoicing the District for monthly payments under the ESLA, and the District began paying EUA for its share of energy savings.

These invoices were based upon EUA's calculation that the installation of its equipment ultimately resulted in a reduction of the District's overall electrical demand by a total of 879.7 KW and 2,573,319 KWH based on the District's hours of operation of the lighting equipment. (Aronson Dep. at 187–190; Porter Dep. at 151–155.) The District paid EUA's invoices for a period from March 1993 to October 1993 in the total amount of $114,421.00.

### 4. Amendment to Initial Contract

By letter dated February 16, 1994, EUA notified the District that it was not meeting the required minimum operating hours specified in the ESLA. (Hammel Aff. at Exh. 16.) The District had previously stopped payments to EUA in late 1993 because of concerns about EUA's performance under the contract (Sullivan Dep. at 139–140.). It contacted EUA to request a review of the District's concerns about the installation and performance of the equipment, as well as the amount of energy savings the District was enjoying under the ESLA.

EUA's representatives met with William Sullivan in June 1994, the District's then-Assistant Superintendent for Business, and Edmond R. Nolin, the District's then-Director of Facilities to discuss a possible amendment to the ESLA under which the District would pay a fixed monthly payment in lieu of monthly payments that varied with the District's hours of use. Nolin signed the amendment to the ESLA ("the Amendment"), which provided that the District would make monthly payments in the amount of $15,315 to EUA for the remaining term of the ESLA. It also provided that the District would pay the outstanding balance of then-overdue invoices under ESLA amounting to $99,999.95. (Hammel Aff. at Exh. 18.) The amendment required that all other terms of the ESLA remain in full force and effect. (Hammel Aff. at. Exh. 18.) No resolution of the District's Board of Education was ever passed authorizing execution of the amendment. (Sullivan Dep. at 163.)

The District subsequently remitted to EUA the overdue payments, totaling $100,693.68. Because the monthly payment had been fixed by the Amendment at

$15,315 without regard to the hours of operation, it was no longer necessary to measure those hours. EUA thus removed the monitoring system from the Premises. (Aronson Aff. at Exh. 8.)

Defendant thereafter made monthly payments to EUA until May 1998. Since execution of the ESLA, the District has paid more than $934,000 to EUA (Pretrial Stipulation ¶ 17). During this period, each monthly payment made by the District to EUA was approved by the District's Director of Facilities, Superintendent for Business, and Board of Education.

### 5. The Alleged Breach

The District did not make payment on EUA's June 1998 invoice, which was due by the end of that month. It did not make any further payments due on the ESLA. Defendant alleges that in May 1998, as a result of a review of the EUA contract conducted by an independent energy consultant, it concluded that EUA had substantially overbilled the District by failing to produce the energy savings that were called for in the parties' proposal and upon which EUA's invoices to the District were based.

Defendant specifically points to EUA's representation in its June 6, 1991 letter that it would reduce the District's electric bill by $213,018 in the first year after implementation of the contract. In the year prior to the contract, the District's electric bills were $543,513 for the buildings covered by the contract. (Feinstein Aff. at Exh. 3) In the one year after, the District's bills were $446,010, representing a reduction of just $97,503. Defendant claims that when the District's payments to EUA were factored in, the District's overall expenditures for electricity substantially increased, contradicting the terms of the ESLA, under which the District was only to pay EUA a percentage of its savings resulting from installation of the equipment.

Plaintiff contends that the 1994 Amendment requires that the District remit $15,315 to EUA for the remainder of the contract term. Paragraph 14(c) of the ESLA provides that the District shall be in default of the Agreement if it fails to make payment to EUA as invoiced by EUA. (ESLA, Hammel Aff. at Exh. 2.) Paragraph 16(a) of the ESLA provides: "In the event of a default by [the District], [EUA] shall have the right to ... Receive from [the District] any amount that is due, or which would become due if [the District] did not default and the Equipment remained installed and active for the term of this Agreement, including all monthly payments due for the remainder of the term of this Agreement, plus costs to remove the Equipment." (Id.)

## DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *See Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden or demonstrating the absence of a disputed issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d

Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement. *See Compagnie Financiere De Cic Et De L'UNION Europeenne, Management Invest. Funding Ltd v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir.2000). Yet summary judgment is only proper in a contract dispute if the language of the contract is wholly unambiguous. *See id.* (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994)). The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court. *See id.* Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993)). While interpretation of ambiguous contract language generally is a question of fact to be resolved by the factfinder, *see id.*, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide to the contrary." *Id.* (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47).

### 1. Breach of Contract

#### a. Performance Under the ESLA

Under New York law, the elements of a breach of contract claim are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996). Plaintiff alleges that it has made out all of the elements for a breach of contract claim. Defendant argues that there remain disputed facts as to whether plaintiff adequately performed under the terms of the contract, and to whether the 1994 amendment was executed by a District representative with the authority to do so.

The District argues that EUA has failed to make out a prima facie case that it performed under the contract by producing the energy savings called for by its proposal. The District points to the Proposal Letter of June 6, 1991, incorporated by reference into the ESLA, that set forth the savings that the District could expect to receive. (ESLA; Hammel Aff. at Exh. 10.) That letter provided that the installation of the Demand Side Management measures would "reduce your energy cost for installed lighting measures" by $213,018 for the first year, and $2,117,394 over fifteen years. (Hammel Aff. at Exh. 10; Lennon Dep. at 50–53.) Defendant argues that it paid EUA based on the invoices submitted by EUA, obligating EUA to produce the savings. Defendant claims that it achieved no savings under the ESLA.

Plaintiff responds that the defendant's suggestion that EUA was bound to deliver $213,018 in costs savings during the first year completely ignores the express terms of the ESLA. EUA states that this figure was an estimate—not a contract term—and maintains that the ESLA itself recognizes that actual energy savings from the Equipment might fluctuate. The kilowatt-hour savings projections by EUA were based on both the kilowatt reduction to be achieved by EUA's equipment as measured under the ESLA and the number of hours that the Premises used their lighting system.

Defendant also calls into question the independence of the audit relied on by EUA to prove that it had produced the energy savings called for by the proposal. Defendant references testimony of an ORU representative who testified that ORU did not perform the verification— rather, that verification was done by ANC Enercom, a contractor unaffiliated with ORU. Plaintiff argues that after the Equipment was installed, EUA and ORU verified a post-installation audit for each building where the Equipment was installed under the ESLA. The post-installation audits confirmed that kw savings attributable to the equipment was 905.23 kw, in excess of the reduction of 639 kw, anticipated by the Proposal Letter.

Finally, the District reviewed a consultant's report that concluded that the District experienced an average reduction of 22% in energy demand was directly attributable to the performance contract. This was in contrast to the 42% decrease predicted by EUA. (Hammel Aff. at Exh. 28.) The consultant concluded that the District had overpaid EUA by approximately $747,214. (Id.) Defendant argues that when the payments to EUA were factored in, the District's overall expenditures for electricity substantially increased, even though the District did not undergo significant capital projects. Because under the terms of the ESLA the District was only to pay EUA a percentage of savings resulting from installation, defendant argues that plaintiff did not perform under the contract.

b. *ESLA's 1994 Amendment*

The question of whether the parties performed under the contract is determined, in part, by whether there was a valid amendment to the ESLA in 1994. The 1994 Amendment had the effect of setting a flat-fee for use of the energy saving equipment, and possibly freeing EUA from specific obligations to produce savings before being compensated. EUA alleges that the amendment was signed and duly executed by a representative of the District with apparent authority to do· so. The District responds that only the School District itself could authorize such a contract; that the plaintiff knew this from past dealings; and that the amendment therefore was not a valid term of the ESLA.

Because the District is the only party with actual authority to enter such contracts, *see* N.Y.Educ.Law § 1725(2) (McKinney 2000) ("Before executing any such agreement, the board of education must adopt a resolution determining that such agreement is in the best financial interests of the school district and stating the basis of that determination"), the questions are (1) whether Edmond Nolin had the apparent authority to amend the ESLA, and if not, (2) whether the District ratified the 1994 Amendment. For the reasons stated below, I find that the 1994 Amendment formed a part of the ESLA as a matter of law.

1. *Apparent Authority*

A principal drapes its agent with apparent authority by holding its agent out in such a way that causes a reasonable third party to believe that the agent is authorized to enter into the transaction in question. *See Lehman Bros. Commercial Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.,* 2000 WL 1702039 (S.D.N.Y. Nov.13, 2000) (*citing Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984)). Apparent authority depends upon outward appearances, and thus can exist even in the absence of actual authority. It requires the following two elements: (1) the principal must, by words or conduct, create an appearance of authority· in the agent; and (2) the third party must reasonably rely on that appearance of authority. *See FDIC v. Providence College,* 115 F.3d 136, 140 (2d Cir.1997). The existence of apparent authority "depends on a factual showing that the third party relied upon the misrepresentations of the agent be-

cause of some misleading conduct on the part of the principal—not the agent." *In Matter of Claim of Bruckner v. Hartford Acc. and Indem. Co.*, 239 A.D.2d 806, 807, 657 N.Y.S.2d 514, 514 (1997). The "existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Graffman v. Delecea*, 1997 WL 620833, at *4 (S.D.N.Y. Oct.8, 1997).

■ Defendant argues that William Sullivan and Edmond Nolin lacked the apparent authority to amend the ESLA in 1994. It references the deposition testimony of Arthur Lennon, EUA's former vice president, who stated that he knew it was "customary for school districts to bring matters of this type to the board for approval." (Hamell Aff. at Exh. 6 (Lennon Dep.) at 62.) Plaintiff disputes that Lennon stated at any point that he knew that the contract would not be valid and binding absent board approval. Accordingly, the record reveals the existence of issues of fact as to whether Nolin had implied authority to enter the contract on behalf of the District.

### 2. *Estoppel and Ratification*

■ But even if Nolin did not have apparent authority to enter into the 1994 Amendment to ESLA, defendants are estopped from asserting lack of authority, because they performed under the amended contract for four years.

■ A governmental agency may be subject to estoppel if it is shown that a manifest injustice resulted from actions taken by the agency in its proprietary or contractual capacity. *See Branca v. Board of Education*, 239 A.D.2d 494, 495–96, 657 N.Y.S.2d 445, 445 (N.Y.App.Div.1997). Such actions must induce justifiable reliance by a party who then changes position to his or her detriment. *See id. (citing Allen v. Board of Educ.*, 168 A.D.2d 403, 404, 563 N.Y.S.2d 422 (N.Y.App.Div.1990).) As a general rule, "where a governmental subdivision acts or comports itself wrong-fully or negligently, inducing reliance by a party who ... changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised." *Bender v. New York City Health and Hospitals Corp.*, 38 N.Y.2d 662, 668, 382 N.Y.S.2d 18, 345 N.E.2d 561 (1976); *Henry Boeckmann, Jr. & Assocs. v. Board of Education*, 207 A.D.2d 773, 616 N.Y.S.2d 395 (1994) (same).

Defendant relies on *In Re Dayho Motel v. Assessor of the Town of Orangetown*, 229 A.D.2d 435, 645 N.Y.S.2d 87 (N.Y.App. Div.1996) for the proposition that any reliance by EUA on Nolin's ability to sign the 1994 amendment on the District's behalf was unreasonable based on past dealings. It seems possible, even likely, that Lennon—who had done prior contracting on behalf of EUA with school boards—had actual knowledge that Nolin lacked the requisite authority to enter into the contract. In response to a question about whether the school board needed to review and approve the contract with EUA, Lennon responded: "It was discussed at the meeting that it would get presented to the board." (Lennon Dep. at 63.)

However, the District will be bound by the amendment if, with actual or imputed knowledge, it ratified Nolin's actions. *See Prisco v. State of New York*, 804 F.Supp. 518, 523 (S.D.N.Y.1992) ("Ratification of the acts of an agent only occurs where the principal has full knowledge of all material facts and takes some action to affirm the agent's actions."). In *Prisco*, the court held that a state entity can ratify acts of its agents by knowingly enjoying the benefits of those acts, even if the acts were unauthorized at the time they were made. *See id.* at 523. Affirmance of the intent to ratify may be inferred from "knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence ..." *Trustees of Am. Fed. of Musicians and Empls. Pension Fd. v. Steven Scott Enter-*

*prises, Inc.,* 40 F.Supp.2d 503, 511 (S.D.N.Y.1999) (*quoting Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland, Ltd.,* 835 F.2d 32, 36 (2d Cir.1987); *J.M. Heinike Assocs., Inc. v. Chili Lumber Co.,* 83 A.D.2d 751, 443 N.Y.S.2d 512, 513 (N.Y.App.Div.1981) ("[A]ffirmance may be inferred from silence when, in the normal course of affairs, one who does not wish 'to consent would speak out.")). From 1994 until June 1, 1998, each monthly payment made by the District to EUA was approved by the District's Director of Facilities, the Superintendent for Business, and the Board of Education. (Hammel Aff. at Exh. 5).

Defendant also cites *A.C. Transp., Inc. v. Board of Education,* 253 A.D.2d 330, 337, 687 N.Y.S.2d 1 (N.Y.App.Div.1999) for the proposition that "the defense of estoppel (or ratification, acquiescence or laches) 'cannot be invoked against a governmental agency to prevent it from discharging its statutory duties.'" *Id.* (quoting *In Re New York State Medical Transp. Assoc., Inc. v. Perales,* 77 N.Y.2d 126, 564 N.Y.S.2d 1007, 566 N.E.2d 134 (1990)). While the New York Court of Appeals in *Perales* indeed held that estoppel claims are foreclosed "in all but the rarest cases," it dismissed a claim for ratification on different grounds than are present in this case. The Court held that there was no ratification because that the principal did not know of the material facts concerning the allegedly binding transaction; that there was no showing that the principal knew of and condoned the agent's practice; that the record did not demonstrate that the principal retained benefits from the petitioners; and that the underlying contract was illegal, and thus, unenforceable. *See Perales,* 77 N.Y.2d at 131, 564 N.Y.S.2d 1007, 566 N.E.2d 134.

In *A.C. Transp.,* 253 A.D.2d at 337, 687 N.Y.S.2d 1, a local Board of Education asserted estoppel defenses (brought as affirmative claims) to the recoupment of funds paid to it by the New York State Education Department for transportation contracts. The State contended that it had overpaid the local Board of Education—based on an incorrect methodology—and sought to recoup the funds. *See id.* at 335, 687 N.Y.S.2d 1. The Board of Education had already paid school bus operators pursuant to the Education Law, and argued that "principles of estoppel prevent the State Education Department from recouping overpayments." *Id.* The Appellate Division disallowed the Board of Education to pursue the claim against the State Education Department, and disallowed a similar claim by the school bus operators against the Board of Education, because they would have interfered with a governmental agency's ability to discharge its responsibility for complying with state law governing rates of compensation for such contracts. *See id.* The court noted that in order to discourage fraud on a massive scale, estoppel claims against a government agency will only be considered in the rarest cases. *See id.* at 337, 687 N.Y.S.2d 1.

The case at bar presents a different situation. The District's agent Nolin may not have had actual or apparent authority to sign the 1994 Amendment on the District's behalf. However, the District acted on that contract, remitting over $100,000 of overdue payments from a period prior to the amendment, and continuing to pay the fixed rate of $15,315 per month for nearly four years afterward. The District therefore had to know of Nolin's actions, *see Prisco v. State of New York,* 804 F.Supp. 518, 523 (S.D.N.Y.1992), took action to ratify them by consistently paying EUA under the amended contract until 1998, and did not repudiate the contract in a way that would be anticipated by one who does not wish to consent. *See Trustees of the Am. Fed of Musicians and Empls. Pension Fd. v. Steven Scott Enterprises, Inc.,* 40 F.Supp.2d 503, 511 (S.D.N.Y.1999). Furthermore, neither party has alleged that the underlying contract was of an illegal nature, *see Perales,* 77 N.Y.2d at 131, 564 N.Y.S.2d 1007, 566 N.E.2d 134,

that the District was prevented from carrying out statutory duties, *see A.C. Transp.*, 253 A.D.2d at 337, 687 N.Y.S.2d 1, nor was there any allegation of fraud. *See id.*

As a result of the District's ratification of Nolin's action, the District is estopped from denying that the 1994 amendment served as part of the ESLA.

### c. The Integrated Contract Terms

The 1994 Amendment adds the following Section 4 of the ESLA, pertaining to "Payment Method (Energy Savings)":

> Customer agrees to make One (1) payment in the amount of $99,999.95 which Customer and Cogenex agree represents the amount currently owing under the Agreement and is due upon execution of this Amendment by Customer; and

> Customer agrees to make One Hundred Fifty–Four (154) consecutive monthly payments each in the amount of $15,315.00 commencing with the invoice for the billing period of May 20 through June 20, 1994. This payment amount shall remain fixed throughout the Term of the Agreement. The value of any additional units of energy saved will be retained by the customer . . . .

> The effect of this First Amendment . . . shall be the same as if the Agreement had been correct originally and in all other respects, all of the terms and conditions of the above captioned Agreement shall remain in full force and effect.

(Hammel Aff. at Exh. 18.)

The parties dispute the effect of the Amendment on the ESLA. Prior to the Amendment, "[t]he amount of payment made by [the District] for energy savings shall be equal to 0% for year 1, 60% for years 2 through 4, 55% for years 5 through 10 and 50% for years 11 through 15 of the savings as shown on the ECR each month for a term of 15 years." (ESLA, Hammel Aff. at Exh. 2.) Despite changing the mea-

surement terms, after the 1994 Amendment, all other terms of the ESLA "remain in full force and effect."

The question of whether the District's agreement to move to a flat-rate payment scheme relieved EUA from providing the "promised" savings is a material fact for a jury to consider. This court is empowered to resolve ambiguity in contractual language as a matter of law if the evidence about the parties' meaning is so one-sided that no reasonable person could decide to the contrary. *See Compagnie Financiere De Cic Et De L'UNION Europeenne, Management Invest. Funding Ltd v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir.2000). And summary judgment will be granted only where the language of the contract is wholly unambiguous. *See id.*

There is sufficient ambiguity in the language of the amended ESLA to deny plaintiff's motion for summary judgment. The ESLA is a contract requiring EUA "to survey, install, maintain and control Energy Conservation Equipment" for the purpose of reducing energy consumption at District schools. (ESLA, ¶ 1.) As originally conceived, EUA was to be paid as a percentage of the energy savings by the District. (Id.¶ 4(a).) The District bore the responsibility of sending on monthly electric bills to EUA for calculation of "the exact amount due and payable and the difference between such amount and the amount previously billed." (Id.¶ 13.)

The defendant alleges that the flat-payment as specified in the Amendment did not relieve EUA of its responsibility to provide energy savings at a certain level. However, by changing the terms of the ESLA, the parties created an ambiguity as to EUA's performance requirements under the contract. Furthermore, after the Amendment, EUA removed its measuring equipment from the District's premises, which made calculation of energy savings impossible. For the foregoing reasons, I conclude that there remain material facts in dispute regarding the terms of the

ESLA on which reasonable minds could disagree.

Plaintiff's motion for summary judgment is therefore denied.

### 2. Covenant of Good Faith and Fair Dealing

■ Under New York law, there is a covenant of fair dealing and good faith implied in all contracts. *See Carvel Corp. v. Diversified Mgmt. Group*, 930 F.2d 228, 230 (2d Cir.1991). "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.1989). In addition, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 243–44 (S.D.N.Y.1997); *Geler v. National Westminster Bank USA*, 770 F.Supp. 210, 215 (S.D.N.Y.1991) (same); *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (holding that the implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties.")

Such a claim may be brought, if at all, only if it is based on allegations different than those underlying the accompanying breach of contract claim. *See Siradas v. Chase Lincoln First Bank*, 1999 WL 787658, *6 (S.D.N.Y. Sept.30, 1999).

Plaintiff argues that the District breached the covenant by failing to pay amounts due and owing under the ESLA. Plaintiff does not charge that this claim is different than the claims underlying the breach of contract action, *see id.*, so it is plainly duplicative. Accordingly, Defendant's motion for summary judgment on the breach of the covenant of good faith and fair dealing claim is granted.

### 3. Unjust Enrichment

■ In order to prevail on a theory of unjust enrichment, "the plaintiff must demonstrate that (a) the defendant has been enriched; (b) the enrichment was at the plaintiff's expense; and (c) defendant's retention of the benefit would be unjust." *Van Brunt v. Rauschenberg*, 799 F.Supp. 1467 (S.D.N.Y.1992) (quoting *Hutton v. Klabal*, 726 F.Supp. 67, 72 (S.D.N.Y.1989)); *see also Mayer v. Bishop*, 158 A.D.2d 878, 551 N.Y.S.2d 673 (3d Dep't), *appeal denied*, 76 N.Y.2d 704, 559 N.Y.S.2d 983, 559 N.E.2d 677 (1990).

■ The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987) (citing *Blanchard v. Blanchard*, 201 N.Y. 134, 138, 94 N.E. 630 (1911)). A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. *See Parsa v. State*, 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 474 N.E.2d 235 (1984). The New York Court of Appeals in *Clark–Fitzpatrick* stated that:

> Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort. The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy. Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved. The law creates it, regardless of the intention of the parties, to assure a just and equitable result.

*Clark–Fitzpatrick*, 70 N.Y.2d at 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (quoting

*Bradkin v. Leverton,* 26 N.Y.2d, 192, 196, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643, 645).

■ It is impermissible to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which clearly covers the dispute between the parties. *See id.* It is only available where the services alleged are sufficiently outside the terms of the contract, *see id.; D'Accord Fin. Servs. v. Metsa–Serla Oy,* 1999 WL 58916 (S.D.N.Y. Feb.8, 1999), or where there is a bona fide dispute as to the existence of a contract. *See Joseph Sternberg, Inc. v. Walber 36th St. Assoc.,* 187 A.D.2d 225, 228 594 N.Y.S.2d 144, 146 (1993).

■ The governing document in this case is the ESLA. Plaintiff alleges that it fully performed under ESLA and its 1994 Amendment, which is part of the governing agreement between the parties as a matter of law. There is no allegation that the services provided by plaintiff were outside the contract, *see D'Accord,* 1999 WL 58916 at *3, nor is there a bona fide dispute as to the existence of a governing contract. *See Sternberg,* 187 A.D.2d at 228, 594 N.Y.S.2d 144. EUA cannot seek damages in an action sounding in quasi-contract, because the suing party is alleging that it fully performed on a valid written agreement which covers the dispute between the parties. *See id.* Accordingly I grant summary judgment for defendant on the unjust enrichment claim.

4. *Counterclaim under N.Y. Gen Bus. L § 349*

■ New York law prohibits the use of deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service. N.Y.Gen. Bus.Law § 349. As a threshold matter, plaintiffs claiming the benefit of Section 349 must charge conduct of the defendant that is consumer-oriented—namely, that the acts or practices have a broader impact on consumers at large. *See Oswego La-*

*borers' Local 214 Pension Fd. v. Marine Midland Bank,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). "To state a claim under this section, a plaintiff must allege that (1) defendant has engaged in an act or practice that is deceptive or misleading in a material way, and (2) plaintiff has been injured by reason thereof. The first element requires that a reasonable consumer would have been misled by the defendant's conduct." *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 636 (2d Cir.1996) Generally, claims under the statute are available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising. *See Genesco Entertainment v. Koch,* 593 F.Supp. 743, 751 (S.D.N.Y.1984).

In *Oswego,* 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741, the plaintiff union desired to open certain interest earning savings accounts with the defendant bank. However, the defendant's representative allegedly opened less advantageous accounts, causing the union to lose more than $30,000 in interest. *See id.* In reinstating the union's consumer fraud claim, the Court of Appeals noted that in enacting General Business Law § 349, the Legislature sought to protect the consuming public from deceptive practices aimed at them. *See id.* The court further noted that the practices proscribed by the statute were those likely to have a broader impact on consumers-at-large and that a plaintiff must prove that the defendant acted deceptively in a meaningful way, resulting in injury to the consumer. *See id.* Though cognizant of a potential flood of litigation, the court concluded that insofar as the bank allegedly steered the union into a less advantageous account without providing full disclosure of the pertinent facts, the plaintiff alleged a viable claim of consumer fraud. *See id.*

■ Although ostensibly directed at "any business," Section 349 is in fact only

"directed at wrongs against the consuming public." *Id.* at 24–25, 623 N.Y.S.2d 529, 647 N.E.2d 741. The threshold requirement of consumer-oriented conduct is met by proof that "the acts or practices have a broader impact on the consumer at large" in that they are "directed to consumers" or "potentially affect similarly situated consumers." *Id.* at 25–27, 623 N.Y.S.2d 529, 647 N.E.2d 741. Judge Weinfeld's opinion in *Genesco Entertainment v. Koch,* 593 F.Supp. 743 (S.D.N.Y.1984), is still instructive:

> The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. The consumer oriented nature of the statute is evidenced by the remedies it provides.... The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small. That the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type is further supported by the origin of the statute. Section 349(h) is substantially modeled on the Federal Trade Commission Act.

*Genesco Entertainment,* 593 F.Supp. at 751–52 (citations omitted).

 The District has made no showing that the contract for the provision of energy-saving equipment is "consumer-oriented" under § 349, nor could it under current case law. Although business-to-business transactions could in some rare cases have a wide enough impact on consumers to justify a § 349 claim, *see Oswego,* 85 N.Y.2d at 25–26, 623 N.Y.S.2d 529, 647 N.E.2d 741, it is well established that "[p]rivate contract disputes, unique to the parties ... would not fall within the ambit of the statute." *See Parex Bank v. Russian Savings Bank,* 116 F.Supp.2d 415, 428 (quoting *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)). *See, e.g., Spirit Partners, L.P. v. audiohighway.com,* No. 99 Civ. 9020, 2000 WL 685022, *7 (S.D.N.Y. May 25, 2000) (finding no § 349 claim for securities transactions); *Barroso v. Polymer Research Corp. of America,* 80 F.Supp.2d 39, 43 (W.D.N.Y.1999) (no § 349 claim for manufacturer's action against chemical company); *Sheth v. New York Life Insurance Co.,* 273 A.D.2d 72, 709 N.Y.S.2d 74, 75 (2000) (finding no § 349 claim for act of life insurance company against prospective life insurance agents).

At issue in the present case is a fifteen year contract, negotiated with the assistance of counsel, involving over $1 million in Equipment. The District therefore cannot prove the first element of a § 349 claim, that EUA's alleged deceptive practices were "consumer oriented."

Plaintiffs motion for summary judgment of Defendant's counterclaim under § 349 is granted. As a result, the Court need not address the other elements of § 349 or whether the District's claim was filed within the relevant statute of limitations period.

## CONCLUSION

There remains one single issue to be tried before a jury: whether the District should be held liable for breach of contract under the ESLA and its 1994 Amendment.

This constitutes the decision and order of the Court.