**FINANCE ONE PUBLIC COMPANY LIMITED, Plaintiff,**

v.

**LEHMAN BROTHERS SPECIAL FINANCING, INC., Defendant.**

**No. 00 CIV. 6739(CBM).**

United States District Court, S.D. New York.

Aug. 2, 2002.

396

Aaron Rubinstein, Michael M. Pomerantz, Kaye Scholer, LLP, New York City, for plaintiff.

Jeffrey Q. Smith, Scott E. Eckas, King & Spalding, New York City, for defendant.

### *OPINION AND ORDER*

MOTLEY, District Judge.

The dispute in this case involves a derivative trading relationship between plaintiff Finance One Public Company Limited ("Fin One"), which until its collapse in 1997 was the largest financial institution in Thailand, and defendant Lehman Brothers Special Financing, Inc. ("LBSF"), a corporate entity through which Lehman Brothers Inc. ("Lehman Brothers"), the investment banking firm, engages in international derivative transactions. At issue is whether LBSF was entitled to avoid paying $9.7 million it admittedly owed Fin One under their derivative trading contract by acquiring from a

related Lehman Brothers entity certain negotiable debt instruments issued by Fin One and asserting Fin One's debt under those instruments as a set-off. Although the face value of the debt instruments LBSF acquired and asserted as a set-off was in the neighborhood of $9.7 million and thus purportedly erased LBSF"s debt to Fin One almost in full, in reality the debt instruments LBSF acquired were virtually worthless due to Fin One's insolvency.

The parties dispute which law—New York or Thai—applies to the various claims and defenses at issue in this case. Because it would have been unnecessarily burdensome to require the parties to brief their already complex cross-motions for summary judgment under both New York and Thai law, the court directed the parties to brief the choice of law issues in advance of briefing the merits of their motions. The court resolved most of the choice of law issues in a memorandum opinion filed on December 4, 2001, holding that New York law controls whether LBSF is liable to Fin One under the derivative trading contract; that Thai law controls whether Fin One is liable to LBSF under the acquired debt instruments; that New York law controls whether the derivative trading contract affords LBSF the right to assert the acquired debt instruments as a set-off; and that the question of which law controls whether LBSF possessed an extra-contractual setoff right would be resolved by applying New York's interest analysis. *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, No. 00 Civ. 6739, 2001 WL 1543820 (Dec. 4, 2001) (hereinafter "December 4 Order").

The parties have now fully briefed the remaining choice of law issue as well as the merits of their cross-motions. For the reasons set forth more fully below, the court holds: (1) that the derivative trading contract does not afford LBSF the right to assert the acquired debt instruments as a set-off; (2) that the derivative trading contract does not expressly preclude LBSF from asserting the set-off; (3) that Thai law controls whether LBSF possessed an extra-contractual set-off right; (4) that it will be necessary for the court to appoint a special master to assist it in resolving the thorny question of whether LBSF possessed an extra-contractual set-off right under Thai statutory, constitutional, and administrative law; and (5) that LBSF is entitled to summary judgment with respect to Fin One's good faith and fair dealing claim.

## BACKGROUND

Fin One is a publicly traded company organized under the laws of the Kingdom of Thailand. Headquartered in Bangkok, Fin One was—until it was shut down by the Thai government in 1997—the single largest financial institution in Thailand. As such, Fin One regularly engaged in interest rate and currency derivative transactions in order to hedge against risks associated with fluctuating interest and currency rates.

LBSF is a Delaware corporation headquartered in New York. LBSF is a wholly owned subsidiary of Lehman Brothers, the investment banking firm, and is one of the entities through which Lehman Brothers engages in international derivative transactions.

In 1995, Fin One and LBSF decided to pursue an ongoing derivative trading relationship, and in June of that year they negotiated and entered into a master contract governing the basic terms of that relationship. The parties executed an ISDA Master Agreement, which is a standard form contract created by the International Swaps and Derivatives Association for use by entities engaging in derivative trading. The ISDA Master Agreement

itself contains no individually tailored terms, but it does contemplate the incorporation of additional schedules through which the parties could and did negotiate terms governing such contingencies as default, termination, settlement, and choice of law. The Master Agreement and its schedules were to be incorporated expressly into each of the individual interest rate and currency swap transactions executed by the parties, thus rendering it unnecessary for the parties to negotiate and agree to terms from scratch every time they wanted to execute a transaction.

Fin One and LBSF executed four interest rate and currency swap transactions between July 1995 and October 1996. Three of these transactions provided that the parties would exchange a certain amount of Thai baht for a certain amount of U.S. dollars on a specified future date, and one was a similar transaction involving the exchange of Thai baht and Japanese yen. Each of these transactions was documented by swap confirmation papers incorporating the terms of the Master Agreement and its schedules.

Beginning in late 1996, Southeast Asia became crippled by a severe financial crisis. Thailand, which had been one of the region's most prosperous economies in the early and mid–1990s, was among the nations hit hardest by this crisis. Interest rates soared, and the value of the Thai baht plummeted. By June 1997 Fin One was insolvent, defaulting on promissory notes and other financial obligations to a multitude of creditors. In order to protect the remaining assets of Thailand's largely insolvent financial sector, the Thai Ministry of Finance stepped in and issued a series of orders beginning on June 26, 1997. Among other things, the Ministry of Finance ordered Fin One to suspend its operations indefinitely.

Although Fin One's overall financial condition was terrible, the soaring interest rates and plummeting baht had caused Fin One to do extraordinarily well in its four derivative trades with LBSF. By June 1997, LBSF owed Fin One almost $10 million as a result of those transactions.

Prior to the financial crisis, Fin One had routinely issued negotiable debt instruments known as bills of exchange. The holder of a bill of exchange is entitled to redeem the note for a certain sum of money on a specified future date. In September 1996, Fin One issued eight bills of exchange to Lehman Brothers (Thailand) Ltd. ("Lehman (Thailand)"), a Lehman Brothers entity incorporated and headquartered in Bangkok that regularly invests in the debt instruments of Thai financial institutions. Lehman (Thailand) subsequently acquired another four Fin One bills of exchange. On their face, these twelve bills of exchange were redeemable in late 1997 for a total of 305 million baht, but as Fin One became insolvent in mid 1997 the bills of exchange became nearly worthless.

In late June 1997, as it became increasingly clear that Fin One would not be able to weather the mounting financial crisis, Lehman (Thailand) sold its Fin One bills of exchange to LBSF. Though no cash changed hands between the two Lehman entities, LBSF purportedly paid Lehman (Thailand) close to face value for the notes. LBSF and Lehman (Thailand) reflected payment for the transaction by crediting and debiting their respective intra-Lehman accounts.

On July 25, 1997, LBSF informed Fin One that it was terminating the derivative transactions based upon a "material adverse change," which Fin One agrees it was entitled to do under the Master Agreement. Four days later, LBSF informed Fin One that it had calculated its debt to Fin One under those terminated transactions to be $9.7 million but that it was asserting the bills of exchange it had

acquired from Lehman (Thailand) as a set-off. According to LBSF, the set-off reduced its outstanding debt to Fin One from $9.7 million to just over $12,000.

Fin One filed the instant lawsuit against LBSF for breach of contract and breach of the duty of good faith and fair dealing in September 2000, claiming that LBSF had no right to erase its debt under the derivative transactions by asserting the bills of exchange as a set-off. The essence of Fin One's claims is that LBSF acquired the essentially worthless bills of exchange from its cousin in bad faith and that the putative set-off was prohibited by both New York and Thai law.

## *DISCUSSION*

### A. The Master Agreement Does Not Give LBSF a Contractual Set–Off Right

■ LBSF first asserts that the Master Agreement itself entitles it to assert the bills of exchange as a set-off. The court previously held that New York law governs this issue pursuant to the agreement's choice-of-law clause. *See* December 4 Order at 1–2.

LBSF argues that an express contractual set-off right can be found in paragraph 6(e) of the Master Agreement. Section 6 of the agreement—entitled "Early Termination"—sets forth various terms that govern in the event that one of the parties elects to terminate the agreement prior to its expiration. Paragraph 6(e)—entitled "Payments on Early Termination"—states in relevant part that "[t]he amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set–Off." LBSF contends that this language gives it broad contractual authority to assert the bills of exchange as a set-off.

The flaw in LBSF's argument is that the term "Set–Off" is defined elsewhere in the Master Agreement to mean any "set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer." The key is the language in the parenthetical: "any Set-off" in section 6(e) means any set-off "arising under this Agreement" (or by operation of law). Read together with this definitional clarification, section 6(e) effectively says only that, upon the early termination of the agreement, any payment that is due will be subject to any set-off that arises *elsewhere* under the agreement (or by operation of law). After all, if the reference to "any Set–Off" in section 6(e) itself vested the parties with a broad contractual set-off right, then it never would be relevant whether other contracts executed by the parties or by operation of applicable law entitled the parties to assert a set-off, and the reference in the definition of set-off to rights arising "under ... another contract [or under] applicable law" would be rendered superfluous. *See New York v. Oneida Indian Nation of New York*, 90 F.3d 58, 63 (2d Cir.1996) (holding under New York law that it is "the cardinal principle of contract construction that all provisions of a contract should be given effect if possible"). Accordingly, the court holds that the reference to "Set–Off" in section 6(e) does not create an independent contractual set-off right but rather simply acknowledges the existence of any contractual set-off right that may have been incorporated into the Master Agreement through additional schedules negotiated by the parties.[1]

---

**1.** The parties negotiated numerous additional schedules pertaining to such contingencies as

default, termination, settlement, and choice of

The court notes that this plain language reading of the agreement is reinforced by the various practice commentaries that have parsed the terms of the form contract the parties utilized. All of these practice commentaries state that the reference to "Set–Off" in paragraph 6(e) of the form contract is simply a "place-holder" for any set-off rights that are negotiated in separate schedules or that exist by operation of law. *See* International Swap Dealers Association, *User's Guide to the 1992 ISDA Master Agreements* 24 (1993) (payments under section 6(e) are subject to any set-off that may apply "by operation of law or that the parties may set forth in a schedule"); *id.* at 54 ("Parties may use th[e] reference [in section 6(e) to 'Set–Off'] as the avenue for augmenting [the Master Agreement] in the Schedule by adding a form of set-off clause they find acceptable.")[2]; Anthony C. Gooch, *Documentation for Derivatives* 88 (Euromoney Publications 1993) (under section 6(e) early termination payments are "subject to any Set-off that the parties have provided for contractually (in the Schedule to their Agreement or otherwise) or that is available under applicable law"); Joshua D. Cohn, *ISDA Master Agreements: 1992 and 1987 Versions Described and Compared* 10 (Practicing Law Institute 1996) ("A set-off provision was considered, but not introduced in the [ISDA Master Agreement]. A 'place-holder' reference to set-off (to be defined by the parties or by operation of law) is contained in section 6(e)."); *id.* at 16 ("Parties must negotiate the existence or not and the breadth of, as well as the mechanism for, set-off); Barry Taylor–Brill, *Negotiating and Opining on ISDA Masters* 117 ("The ISDA Master

does not include a set-off clause with respect to other obligations of the parties.").

## B. The Master Agreement Does Not Preclude LBSF From Asserting an Extra–Contractual Set–Off Right

■ Fin One argues not only that the Master Agreement does not entitle LBSF to assert the bills of exchange as a set-off, but also that the Master Agreement expressly forbids LBSF from doing so. Fin One points to paragraph 8(a), which requires all payments under the contract to be made in the applicable "Contractual Currency," and paragraph 1(g) of the appended schedule, which states that the "Contractual Currency" is U.S. dollars. Fin One contends that LBSF was therefore required to make payment in U.S. dollars, not by asserting bills of exchange denominated in Thai baht as a set-off.

As LBSF points out, however, paragraph 1(g) of the schedule also entitles it— upon the occurrence of an "Event of Default"—to make payment in any currency in which any transaction had been executed, including Thai baht. (Fin One's insolvency certainly had been an Event of Default as defined in paragraph 5(a)(vii)(2) of the Master Agreement.) Fin One counters that LBSF informed it in writing that it was terminating the contract because of a "material adverse change," not because of an Event of Default. Nothing in paragraph 1(g) of the schedule, however, required LBSF to cite the Event of Default expressly before tendering payment in Thai baht (or, in this case, by asserting bills of exchange denominated in Thai baht as a set-off).

---

law, but nothing in any of the schedules gives the parties a contractual set-off right.

**2.** Indeed, in this User's Guide the ISDA warned presciently that "without an effective set-off clause, one party might be required to

make payment" to the other "while, at the same time, the [first] party may not have any realistic expectation of receiving payments owed to it by the [other party] under other agreements." *Id.*

Moreover, Fin One's "Contractual Currency" argument is substantially in tension with the plain language of the definitions section of the contract, which recognizes any right to set-off arising "under ... another contract, applicable law or otherwise." It is telling that this term does not require the obligation being asserted as a set-off to be denominated in any particular currency. Clearly, the schedule's "Contractual Currency" provision was entitled to apply only to an actual cash payment, not to an asserted set-off.

Accordingly, the court holds that nothing in the Master Agreement precludes LBSF from asserting any set-off to which it might be entitled by operation of law.

## C. Thai Law Governs Whether LBSF Enjoys an Extra–Contractual Set–Off Right

█ The court previously held that New York's "interest" analysis must be applied to determine which law—New York or Thai—governs whether LBSF enjoys an extra-contractual set-off right by operation of law. *See* December 4 Order at 3–4. New York's interest analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) (internal quotations omitted).

█ LBSF contends that New York law should govern, arguing that New York has a paramount interest (1) in applying its law to disputes arising out of international finance transactions between its citizens (LBSF is headquartered in New York) and foreign companies; (2) in "insuring the stability and predictability of international financial markets"; and (3) in "maintaining its role as the world's leading financial

center." LBSF Br. at 6. The court agrees that these are significant interests worthy of consideration. The problem with LBSF's argument, however, is that Thailand has more or less an equal interest in having its law applied to this dispute for the same three reasons. (Bangkok may not literally be "the world's leading financial center," but it certainly is a very important financial center, especially in Southeast Asia.)

More importantly, the circumstances surrounding the dire financial crisis that crippled Southeast Asia in 1997—thus directly giving rise to this dispute—vest Thailand with a mammoth interest in having its law applied, one that easily dwarfs any competing interest New York might have. In late June of that year, the Thai government attempted to stabilize its economy by ordering fifty-eight of its financial institutions—including Fin One, then its largest—to cease operations. The Thai Ministry of Finance specifically ordered Fin One not to make any payments on its outstanding debts, including its bills of exchange, and not to allow its debtors to assert those bills of exchange as set-offs. The Ministry of Finance stated that it was taking such extreme measures "[i]n order to alleviate the problems surrounding the financial standing and operations of [Fin One] and so as to ensure the stability and well-being of the financial system as a whole." Thai Ministry of Finance, *Order of Cessation of Business Operation of Finance One Public Co. Ltd.,* No. 139/2540, at 1 (Jun. 26, 1997); *see also* Thai Ministry of Finance, *Order of Cessation of Business Operation of Finance One Public Co. Ltd.,* No. 158/2540 (Jul. 25, 1997) (extending the June 26 order indefinitely). As will be discussed in more detail below, it is far from clear whether the Ministry of Finance had either the statutory or constitutional authority to preclude LBSF from asserting whatever set-off right it may

have enjoyed under the Thai Civil and Commercial Code. It is quite clear, however, that—whatever the outcome of this case under Thai law—Thailand's interest in salvaging the viability of its largest financial institutions and resuscitating its economy is far superior to any interest New York may have in this litigation.

Accordingly, the court holds that Thai law controls whether LBSF enjoys an extra-contractual set-off right by operation of law.

### D. Identifying and Applying Thai Law

We thus come to the ultimate issue in this case: whether, under Thai law, LBSF was entitled to assert the bills of exchange it acquired from Lehman (Thailand) to set-off its debt to Fin One under the derivative trading transactions. LBSF points to section 341 of the Thai Civil and Commercial Code, which generally permits set-off:

> If two persons are bound to each other by obligations whose subject is of the same kind and both of which are due, either debtor may be discharged from his obligation by set-off to the extent to which the amounts of the obligations correspond, unless the nature of one of the obligations does not admit of it.

Fin One, on the other hand, points to the June 26 and July 25 Ministry of Finance orders, arguing that these orders expressly preclude LBSF's ability to assert the bills of exchange as a set-off against the debt it owed Fin One. The parties disagree about whether the Ministry of Finance orders apply to LBSF, as opposed to applying only to Fin One, and about whether the Ministry of Finance enjoyed the requisite statutory and constitutional authority to preclude LBSF from asserting the set-off to which it arguably was entitled under the Civil and Commercial Code.[3]

Fin One has offered the expert testimony of Suchart Sooksumitr, a former Judge on the Supreme Court of Thailand. Judge Sooksumitr has testified that the Ministry of Finance orders apply to any entity doing business with Fin One, not just to Fin One itself, and that the orders were a valid exercise of the authority delegated by the Thai Parliment to the Ministry of Finance to regulate financial institutions. LBSF has offered the expert testimony of Sahaton Rattanapijit, a law professor at Thammasat University in Bangkok. Professor Rattanapijit has testified that the Ministry of Finance has no jurisdiction to order LBSF to do or refrain from doing anything, and that the Ministry of Finance certainly has no authority to strip LBSF of set-off rights it enjoys under the Civil and Commercial Code. Judge Sooksumitr and Professor Rattanapijit have both cited a plethora of Thai Supreme Court opinions, and they have engaged in a spirited debate about the proper interpretation of those opinions and how to apply them to the apparently thorny issues of Thai administrative law presented here.

The fact that both of these esteemed experts have argued their respective positions cogently presents the court with a quandary: whom to believe? To be sure, the court is not bound to limit its inquiry to the opinions espoused by the parties' experts. Federal Rule of Civil Procedure 44.1 allows district courts to determine foreign law by considering "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Indeed, the Second Circuit has specifically "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of

---

3. The parties also dispute whether the set-off was proper under the Civil and Commercial Code. Fin One contends, and LBSF disagrees, that the set-off was asserted in bad faith and that the requisite mutuality was lacking.

foreign nations." *Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998). In the instant case this is easier said than done, however, because the court's library does not carry Thai reporters, nor are they available on Westlaw or Lexis–Nexis. Further compounding the problem, neither the undersigned nor her capable law clerks speak much Thai.

Given the rather unusual complexity of the foreign law issues presented in this case, and given that almost $10 million rides on their proper resolution, the court believes it has no choice but to appoint a special master to assist it in identifying and applying Thai law to the parties' claims and defenses. Accordingly, the parties are hereby ORDERED to meet and confer on or before September 20, 2002 and, if possible, to identify one or more mutually agreeable candidates for special master. If the parties are unable to stipulate to the acceptability of any candidates by September 20, then the court will appoint a special master of its own choosing shortly thereafter. In any event, the special master's fees shall be paid by the parties in equal shares.

### E. The Good Faith and Fair Dealing Claim

 LBSF has also moved for summary judgment with respect to Fin One's good faith and fair dealing claim. LBSF argues correctly that a plaintiff may not maintain a good faith and fair dealing claim where that claim is based upon the same factual allegations and seeks the same damages as the plaintiff's claim for breach of an express provision of the contract. *See EUA Cogenex v. North Rockland Cent. Sch. Dist.,* 124 F.Supp.2d 861, 873 (S.D.N.Y. 2000) (under New York law, a duty of good faith and fair dealing claim "may be brought, if at all, only if it is based on allegations different than those underlying the accompanying breach of contract claim"); *see also Cross & Cross Props.,*

*Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989) ("A claim for breach of the implied covenant [under New York law] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.").

The only authority Fin One cites in response is *deCiutiis v. Nynex Corp.,* No. 95 Civ. 9745, 1996 WL 512150 (S.D.N.Y. Sep.9, 1996). However, that case merely held that a plaintiff may assert a duty of good faith and fair dealing claim alongside a breach of contract claim where the duty of good faith and fair dealing claim seeks only to constrain decisionmaking discretion granted to one party through the contract. *See id.* at *3. That scenario has nothing to do with the facts of this case and casts no doubt on the general rule that a plaintiff cannot assert a breach of contract and a breach of good faith and fair dealing claim redundantly.

Accordingly, LBSF's motion for summary judgment with respect to Fin One's good faith and fair dealing claim is hereby GRANTED, and that claim is hereby DISMISSED with prejudice.

### CONCLUSION

For the foregoing reasons, the court holds: (1) that the derivative trading contract does not afford LBSF the right to assert the acquired debt instruments as a set-off; (2) that the derivative trading contract does not expressly preclude LBSF from asserting the set-off; (3) that Thai law controls whether LBSF possessed an extra-contractual set-off right; (4) that it will be necessary for the court to appoint a special master to assist it in resolving the thorny question of whether LBSF possessed an extra-contractual set-off right under Thai statutory, constitutional, and administrative law; and (5) that LBSF is

entitled to summary judgment with respect to Fin One's good faith and fair dealing claim. The parties shall meet and confer on or before September 20, 2002 and, if possible, identify one or more mutually agreeable candidates for special master.

SO ORDERED.