FINANCE ONE PUBLIC COMPANY
LIMITED, Plaintiff–Appellee–
Cross–Appellant,

v.

LEHMAN BROTHERS SPECIAL
FINANCING, INC., Defendant–
Appellant–Cross–Appellee,

Sompong Sucharitkul, Dr.,
Special Master.[1]

Nos. 03–9049(L), 03–9096(XAP).

United States Court of Appeals,
Second Circuit.

Argued: Nov. 8, 2004.

Decided: July 12, 2005.

---

1. The official caption currently lists the special master before the parties. The Clerk of Court is instructed to alter the official caption to conform to that appearing here.

Scott E. Eckas, King & Spalding LLP (Jeffrey Q. Smith and Jennifer L. Hurley, on the brief), New York, NY, for Defendant–Appellant–Cross–Appellee.

Aaron Rubinstein, Kaye Scholer LLP (Michael M. Pomerantz and Carly Henek, on the brief), New York, NY, for Plaintiff–Appellee–Cross–Appellant.

Michael S. Feldberg and Joshua D. Cohn, Allen & Overy LLP, New York, NY, for Amicus Curiae International Swaps and Derivatives Association.

WALKER, Chief Judge, POOLER and WESLEY, Circuit Judges.

## BACKGROUND

POOLER, Circuit Judge.

This is a contract dispute in diversity between a Thai company and a Delaware corporation. Plaintiff-appellee-cross-appellant Finance One Public Company Ltd. ("Finance One"), a now-defunct publicly traded Thai corporation with its principal place of business in Bangkok, was once the largest financial company in Thailand. Defendant-appellant-cross-appellee Lehman Brothers Special Financing, Inc. ("LBSF"), a Delaware corporation with its principal place of business in New York, is part of the Lehman Brothers family of companies, and is used as Lehman Brothers' global vehicle for derivatives transactions. In 1995, LBSF and Finance One entered into a derivatives trading relationship.

The International Swaps and Derivatives Association ("ISDA"), the principal

industry association of the derivatives industry, publishes a standard form contract known as the "Master Agreement," which is the industry standard in general use worldwide for formalizing derivatives trading arrangements.[2] The Master Agreement[3] consists of 18 pages of terms uniform across contracts, and calls for parties to attach a "Schedule" containing other terms individually tailored to their particular relationship. The Master Agreement contains a choice-of-law clause directing parties to specify governing law in the Schedule. It contains a forum-selection clause requiring parties to submit to the jurisdiction of either English or New York courts if the Schedule selects English or New York law, respectively, to govern the agreement. LBSF and Finance One executed a contract consisting of the Master Agreement and an attached Schedule on June 30, 1995. In the Schedule, the parties chose New York law as the "governing law." Individual transactions were to be documented in "Confirmations" whose form was specified in the Schedule.

In 1995 and 1996, LBSF and Finance One entered into four derivatives transactions. The parties entered into interest-rate and currency swap transactions on July 7, 1995, January 12, 1996, and October 24, 1996. On February 28, 1996, another Lehman company entered into a currency option transaction with Finance One that it subsequently assigned, with the consent of Finance One, to LBSF effective April 26, 1996. Each of the swap transactions, and assignment of the currency option transaction, was negotiated by Finance One representatives in Bangkok and LBSF representatives in Tokyo or Hong Kong, and was listed in LBSF records as originating in the Tokyo or Hong Kong

offices of LBSF. The Confirmations were mailed from LBSF's New York headquarters.

In September and October 1996, Finance One issued seven bills of exchange, with a total face value of 175,000,000 Thai baht, to Lehman Brothers (Thailand), Ltd. ("LBT"), a Thai company with its principal place of business in Bangkok, and another member of the Lehman family. These bills were Thai baht-denominated negotiable debt instruments with a one year term to maturity. In March 1997 LBT purchased from a third party an additional five bills of exchange issued by Finance One, with a total face value of 130,000,000 Thai baht and a maturity date of January 12, 1998.

In 1996 Thailand, like much of southeast Asia, entered the throes of a financial crisis. The Thai Ministry of Finance intervened in an attempt to mitigate the damage to the country's financial sector, ultimately issuing an order on June 26, 1997, suspending business operations of Finance One for thirty days. On June 24 or 25, 1997, before the Ministry of Finance order was issued, representatives of LBT and LBSF had negotiated the transfer of the 12 bills of exchange to LBSF. In return for transferring the bills to LBSF, LBT received a credit on intercompany accounts in the amount of the value at which the bills had been carried on LBT's books. The bills were endorsed over to LBSF by their custodian, Bangkok Bank, on June 27, 1997, pursuant to authorization from LBT.

On July 25, representatives from LBSF's Hong Kong and Tokyo offices visited Finance One's Bangkok office to pro-

---

**2.** The ISDA appears here as *amicus curiae,* arguing for modification of the district court's interest award.

**3.** References herein to the Master Agreement are to the 1992 version published by the ISDA.

pose that Finance One allow LBSF to set off the face value of the bills of exchange against LBSF's derivatives obligations, offering Finance One a $1 million bonus to seal the deal. Finance One rejected the offer, stating that payment of the bills was prohibited by the Ministry of Finance's June order. That same day, a Lehman representative wrote to Finance One terminating the four derivatives transactions "in accordance with the terms of the Confirmations relating to such Transactions." Also that same day, an LBSF representative presented the bills for payment at Finance One's Bangkok office, was refused, and filed a customary "notice of dishonor and protest" with the Royal Thai Police Department. The Ministry of Finance issued another order dated July 25, 1997, extending Finance One's suspension indefinitely.

By letter dated July 29, 1997, LBSF notified Finance One that it had calculated the aggregate amount LBSF owed to Finance One under the derivative transactions as $9,664,204, and was setting off against this amount the value of the bills, which was $9,651,898.73, leaving a balance of $12,305.27 in Finance One's favor, which LBSF paid. On December 8, 1997, Finance One ceased operations entirely and was placed under the supervision of the newly created Financial Sector Restructuring Authority to wind up its affairs, liquidate its assets, and pay off its creditors.

On September 7, 2000, Finance One commenced this lawsuit, in which it seeks $9,651,898.73 in damages for breach of contract and breach of the duty of good faith and fair dealing based on LBSF's failure to pay the entirety of its derivatives obligation. After discovery was completed, both parties declared their intention to move for summary judgment at a status conference in September 2001. Because

the parties disagreed about the applicable law, LBSF asserting that New York law applied and Finance One that Thai law applied, the district court ordered a preliminary round of briefing on the choice-of-law issues. By memorandum opinion and order filed December 4, 2001, the district court found that to the extent that LBSF argued that its setoff right was created by the Master Agreement, this issue would be governed by New York law in accord with the Master Agreement's choice-of-law clause, but in the event that LBSF had to rely on other sources of law, the court was not prepared to decide which jurisdiction's law governed the question whether an "extra-contractual setoff right [existed] by operation of law." *Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, No. 00 Civ. 6739, 2001 WL 1543820, at *2, 2001 U.S. Dist. LEXIS 19923, at *6 (S.D.N.Y. Dec. 4, 2001). Finding the parties' briefing inadequate to resolve how New York courts would answer this choice-of-law question, the court ordered the parties to submit supplemental briefs addressing the outstanding choice-of-law issues. By opinion and order filed August 9, 2002, the court held that the Master Agreement did not itself either confer a setoff right or prohibit setoff, and that Thai law governed the existence or nonexistence of an extra-contractual setoff right. Finding it impossible to decide which party's experts on Thai law to credit, the court ordered that the parties submit lists of proposed special masters to identify and apply Thai law. *See Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 215 F.Supp.2d 395, 402–403 (S.D.N.Y.2002). The parties submitted their lists and objections, and the court appointed Dr. Sompong Sucharitkul, a professor at the Golden Gate University School of Law, as Special Master.

The Special Master submitted a report on January 17, 2003. The parties differ in their characterization of the report, Fi-

nance One characterizing it as finding no right to setoff under Thai law, but nevertheless going on to create one based on the Master's view of the equities, and LBSF characterizing it as finding an absolute right to setoff under Thai law, but nevertheless going on to limit it based on the Master's view of the equities. In fact, the Master clearly recognized the existence of a statutory right to setoff under Section 341 of the Thai Civil and Commercial Code. However, noting that it was unclear whether LBSF satisfied the statute's requirement that it be a bona fide purchaser for value, the Master recommended that the court "apply the law of [Thailand] as if the Court were to sit in judgment as a national court on site," exercising "all the judicial discretion pertaining to Thai Justices *in simile casu.*" He explained that "LBSF could be deemed to have a right to set-off which is not unqualified ... a Thai court could exercise its judicial discretion in an equitable manner .... It would be for the Trial Judge to assess the residual value or the market value of the 12 Bills of Exchange in question for purposes of set-off." The Master then proposed a means of valuation: in order to ensure that LBSF was treated with the same priority as any other Finance One creditor, LBSF would receive a proportion of the bills' face value equal to Finance One's ratio of assets to liabilities, or 44.4%. The Master stated that by this solution, "justice would be better served than either of the two extremes ...."

In response to the court's request for clarification, the Master submitted a Supplemental Report on April 3, 2003. The Master reiterated that a statutory right to setoff existed, but explained that the bare right to setoff was not conclusive of the value that LBSF was entitled to set off, and stated that his proposed solution was "authorized by Thai law" in order to further Thailand's policy of protecting creditors.

By memorandum opinion and order filed May 1, 2003, the district court accepted the Special Master's recommendation, calculated the precise amount of the setoff, yielding a figure of $4,300,866.07, and held that Finance One was entitled to the balance of the outstanding derivatives obligation as damages. *Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* No. 00 Civ. 6739, 2003 WL 2006598, 2003 U.S. Dist. LEXIS 7269 (S.D.N.Y. May 1, 2003). On May 13, 2003, the court ordered briefing on the applicable rates of pre- and post-judgment interest. By memorandum opinion and order filed July 11, 2003, the court found the appropriate rates to be 17.04% for pre- and 18.04% for post-judgment interest. *Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* No. 00 Civ. 6739, 2003 WL 21638214, 2003 U.S. Dist. LEXIS 11784 (S.D.N.Y. July 11, 2003). Judgment was entered to that effect on July 17, 2003.

On July 31, 2003, Finance One moved for clarification and correction of the judgment under Fed.R.Civ.P. 60(a), and LBSF moved to reconsider, alter, or amend, under Fed.R.Civ.P. 59(e) and 60(b). The court denied LBSF's motion on the grounds that it was untimely, and that it sought to relitigate issues already considered and rejected and to raise new issues. The court granted Finance One's motion, entering judgment with amended rates of interest. *Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* No. 00 Civ. 6739, 2003 WL 22056983, 2003 U.S. Dist. LEXIS 15265 (S.D.N.Y. Sep.4, 2003).

Both parties timely appealed, Finance One claiming that no right to setoff existed and it was entitled to payment in full, and LBSF claiming that it was entitled to its original setoff of the full face value of the bills, and so had no further obligations to

Finance One. LBSF additionally challenged the district court's calculation of the rates of pre- and post-judgment interest. We affirm the district court's determination that Thai law governs ·LBSF's claimed setoff right, but, finding LBSF entitled to setoff under Thai law, we reverse the judgment entered for Finance One and order that judgment be entered for LBSF. We therefore need not reach the interest-rate issue.

## DISCUSSION

### I. Choice of Law

■ We review the district court's choice of law *de novo*. *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir.1998). As jurisdiction is grounded in diversity, we apply the forum state's choice-of-law rules. *Id.* at 12. LBSF argues that New York law should be applied to the question of its setoff rights, on three grounds. First, LBSF argues that before applying non-forum law, a court is required to find as a threshold matter that the differences between the two jurisdictions' rules would be "outcome determinative." Second, LBSF argues that the setoff issue falls within the scope of the choice-of-law provisions in the Master Agreement and accompanying Schedule, which select New York law. Third, LBSF argues that under New York's "interest analysis," New York courts would apply New York law to the setoff question.

#### A. Material Conflict

LBSF argues that because Finance One has alleged that the outcome under either Thai law or New York law would be the same-the setoff would be barred and Finance One would receive the whole of LBSF's outstanding derivatives obligation as damages-Finance One therefore fails to allege a "material conflict" between the two jurisdictions' rules and is thus precluded from seeking the application of non-forum law.

■ LBSF is correct that we would not have occasion to embark on a choice-of-law analysis in the absence of an "actual conflict" between the applicable rules of two relevant jurisdictions. *See In re Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936 (1993). However, LBSF's argument hinges on its assumption, unsupported by any authority, that "actual conflict" exists only where the choice of which rule to apply has been demonstrated to be "outcome determinative." This assumption is incorrect. Rather, the requirement is that "the applicable law from each jurisdiction provides different substantive rules . . . ." *Curley*, 153 F.3d at 12. The differences must be "relevant" to the issue at hand, *Tronlone v. Lac d'Amiante Du Quebec, Ltee*, 297 A.D.2d 528, 747 N.Y.S.2d 79, 80 (App. Div. 1st Dep't 2002), and must have a "significant *possible* effect on the outcome of the trial," *Simon v. Philip Morris, Inc.*, 124 F.Supp.2d 46, 71 (E.D.N.Y.2000) (emphasis added). But a party seeking application of non-forum law is not required, as LBSF implies, to demonstrate that its case would be lost were the court to apply forum law. Such a requirement ·would be absurd, and so it is no surprise that LBSF cites no authority that supports it. Rather, LBSF relies solely on cases holding that where *the court* has determined that the result would be the same under either jurisdiction's law, it need not decide which to apply. *See, e.g., Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir.1999). This is a very different, and quite unremarkable, proposition. Naturally a court need not decide issues whose resolution it has determined can have no possible effect on the ultimate disposition of the case. This does not imply, however, that before embarking on

a choice-of-law analysis a court must apply the relevant substantive rules of each jurisdiction to the facts of the case and determine what the various results would be and whether they would differ.

■ Finance One identifies a number of provisions of Thai substantive law that are potentially decisive and that have no New York law equivalent: the legal effect to be given to the Thai Finance Ministry's orders; Thai case law holding conduct allegedly similar to LBSF's to be in bad faith as a matter of law; various alleged requirements before the bills could be validly transferred under Thai law; significant differences between the New York and Thai statutes governing setoff, with the Thai statute imposing a number of requirements not found in the New York statute; and a Thai public policy of treating similarly situated creditors equally. These are certainly relevant substantive differences that could have a significant impact on the outcome of the case. This is all that Finance One is required to demonstrate in order to invoke a choice-of-law analysis.

### B. The Master Agreement Choice–of–Law and Forum–Selection Clauses

Paragraph 13 of the Master Agreement provides:

13. Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:-

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York . . . .

The attached Schedule provides:

(h) Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

LBSF argues that the choice-of-law clause, in light of the forum-selection clause, is sufficiently broad to require that New York law be applied to LBSF's setoff claim. The effect of the choice-of-law clause depends on both its validity and its scope.

■ The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses. *See, e.g., Valley Juice Ltd. v. Evian Waters of France, Inc.,* 87 F.3d 604, 607–08 (2d Cir. 1996) (in diversity case transferred from Massachusetts federal district court, applying Massachusetts law to determine validity of contractual choice-of-law clause specifying that New York law governed contract). In this case, neither party disputes the validity of the choice-of-law clause; instead, they differ over its scope.

Determining which jurisdiction's law governs the scope of a valid choice-of-law clause is not a simple matter. On the one hand, once a court finds that a contractual choice-of-law clause is valid, the law selected in the clause dictates how the contract's provisions should be interpreted, and so arguably that law should also dictate how the choice-of-law clause-which is itself one of the contract's provisions-should be in-

terpreted. *See Odin Shipping Ltd. v. Drive Ocean V MV,* 221 F.3d 1348 (Table), 2000 WL 576436, at *1, 2001 U.S.App. LEXIS 11098, at *3 (9th Cir. May 11, 2000) (unpublished) ("The *scope* of [a choice-of-law] provision is a matter of contract construction and interpretation, however, which would in turn be governed by the law selected in the choice-of-law provision."). More commonly, however, courts consider the scope of a contractual choice-of-law clause to be a threshold question like the clause's validity. Courts therefore determine a choice-of-law clause's scope under the same law that governs the clause's validity-the law of the forum. *See, e.g., Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996) (applying New York law to interpret scope of choice-of-law clause that selected Massachusetts law); *Maltz v. Union Carbide Chems. & Plastics Co.,* 992 F.Supp. 286, 296 (S.D.N.Y.1998) (in diversity case transferred from Texas federal district court, applying Texas law to determine scope of choice-of-law clause that specified New York law); *cf. Hodom v. Stearns,* 32 A.D.2d 234, 301 N.Y.S.2d 146, 148 (App. Div. 4th Dep't 1969) (applying New York law to interpret scope of forum-selection clause specifying that suits under contract be brought in Oregon courts). Different states may approach the question of what law governs the scope of a choice-of-law clause in different ways-in State A, the law selected in the choice-of-law clause might govern that clause's scope, while in State B, forum law, which governs the clause's validity, might also govern the scope. Finally, parties could-though they rarely do-specify in the choice-of-law clause itself what law should govern questions about the clause's scope.

▮▮▮ The district court in this case, sitting in diversity, was bound to apply New York law to determine the scope of the contractual choice-of-law clause. New York courts decide the scope of such clauses under New York law, not under the law selected by the clause, which here also happens to be New York law. *See J.A.O. Acquisition Corp. v. Stavitsky,* 192 Misc.2d 7, 745 N.Y.S.2d 634, 638 (Sup.Ct. N.Y. County 2001) (applying New York law to determine scope of choice-of-law clause that selected New Jersey law). LBSF argues that under New York law as explained in *Turtur v. Rothschild Registry International, Inc.,* 26 F.3d 304 (2d Cir. 1994), the choice-of-law clause in the Schedule, in light of the forum-selection clause in the Master Agreement, is broad enough to encompass setoff rights arising from sources, like the bills of exchange, outside of the contract.

LBSF's appeal to *Turtur* is unavailing, for a simple reason: the court in *Turtur* did not apply New York law to determine the scope of the contractual choice-of-law clause at issue in that case, it applied Texas law. The underlying dispute in *Turtur* began in Texas state court and was removed to the United States District Court for the Southern District of Texas. *Id.* at 306. Five years later, after all defendants except a New Jersey-based law firm had been dismissed, the case was transferred to the Southern District of New York. *Id.* The transfer was ordered not because venue was improper in the Texas federal district court, but rather for the convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a). Appellants' Br. at 1, *Turtur* (No. 93–7966), *available at* 1993 WL 13011829. Following such a transfer, "the transferee court must follow the choice-of-law rules that prevailed in the transferor court." *Ferens v. John Deere Co.,* 494 U.S. 516, 519, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). The transferor court in *Turtur* was a Texas federal district court, and the Second Circuit, in reviewing the New York federal district court's decision, was bound to-and

did-apply Texas's choice-of-law rules to determine the validity and scope of the contractual choice-of-law clause at issue.

Although the discussion of this issue in *Turtur* was limited, the court focused primarily on distinguishing a Texas state case, 26 F.3d at 309, and concluded that "[w]e agree with the Texas district court, which originally ruled on this issue," as to the scope of the choice-of-law clause in dispute. *Id.* at 310. By stating that "both New York and Texas recognize the right of contracting parties to agree to choice of law" and citing one Texas and one New York case, *id.*, *Turtur* obscured which state's law dictated the validity and scope of the choice-of-law clause at issue. And because the choice-of-law clause at issue selected New York law, it is understandable that subsequent courts-failing to distinguish between the law governing a choice-of-law clause's scope and the law selected by the clause-have read *Turtur* as applying New York law governing the scope of choice-of-law clauses. *See, e.g., Krock,* 97 F.3d at 645;[4] *Bibeault v. Advanced Health Corp.,* No. 97 Civ. 6026, 1999 WL 301691, at *6, 1999 U.S. Dist. LEXIS 7173, at *17–*18 (S.D.N.Y. May 12, 1999). Nevertheless, *Turtur* is better read as having applied Texas law to determine the validity and scope of the contractual choice-of-law clause at issue. As authority for New York law, therefore, *Turtur* is irrelevant to this case, except to the extent that its reasoning is persuasive and consistent with governing New York law.

We turn, therefore, to the leading New York case on the scope of choice-of-law clauses, *Knieriemen v. Bache Halsey Stuart Shields Inc.,* 74 A.D.2d 290, 427

N.Y.S.2d 10 (App. Div. 1st Dep't 1980), *overruled on other grounds, Rescildo v. R.H. Macy's,* 187 A.D.2d 112, 594 N.Y.S.2d 139 (App. Div. 1st Dep't 1993). *Knieriemen* involved a contract between a New Orleans brokerage firm and a customer that contained a choice-of-law clause that "recited that '[t]his contract shall be governed by the laws of the State of New York.'" 427 N.Y.S.2d at 12 (brackets in original). The broker lost a substantial amount of the customer's money, and the customer sued for fraud, breach of contract, negligence, and churning. The court held that the contractual choice-of-law clause did not reach tort claims: "That the parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort . . . ." *Id.* at 12–13.

*Knieriemen* indicates a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action. More recent decisions reflect a similar tendency. In *Twinlab Corp. v. Paulson,* 283 A.D.2d 570, 724 N.Y.S.2d 496, 496 (App. Div.2d Dep't 2001), a suit by a company against outside consultants for breach-of-contract and tort claims based on Florida's civil RICO statute, the court considered the scope of choice-of-law and forum-selection clauses that provided as follows: "The choice of law provision stated, *inter alia,* that the 'validity, interpretation, construction and performance' of the agreement would be governed by and construed in accordance with New York law. It also designated New York as the forum for any actions 'relating directly or indi-

---

4. *Krock* assumed, without discussion, that *Turtur* stood for New York law on the scope of choice-of-law clauses. 97 F.3d at 645. Because this assumption was not a holding of *Krock,* this circuit's rule that a prior panel decision is binding "until its rationale is over-

ruled, implicitly or expressly, by the Supreme Court or this court en banc," *United States v. Ianniello,* 808 F.2d 184, 190 (2d Cir.1986), does not prevent us from revisiting *Krock*'s interpretation of *Turtur.*

rectly' to the consultant agreement." *Id.* The court held that the Florida civil RICO claim, which was based on the defendant's "alleged criminal activities, which were unrelated to his duties as a consultant," fell outside the scope of the contractual choice-of-law and forum-selection provisions. *Id.*

Under New York law, then, tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause. *See Krock,* 97 F.3d at 645 ("Under New York law, a choice-of-law provision indicating that the *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract."); *Twinlab Corp.,* 724 N.Y.S.2d at 496 (citing *Krock* ). Presumably a contractual choice-of-law clause could be drafted broadly enough to reach such tort claims. *See Krock,* 97 F.3d at 645 (stating that a "sufficiently broad" choice-of-law clause would reach claims of tort arising incident to the contract). However, no reported New York cases present such a broad clause.

Case law applying New York law thus provides little guidance on the question raised in this case: whether the choice-of-law clause in the Master Agreement and Schedule, in light of the forum-selection clause, is sufficiently broad to reach a setoff claim arising from an extra-contractual source. Based on New York courts' reluctance to read choice-of-law clauses broadly, however, together with the fact that the parties could have, but did not, include within their agreement a provision creating setoff rights, we hold that as a matter of New York law, extra-contractual setoff rights fall outside the scope of the choice-of-law clause in the Master Agreement and Schedule.

The Schedule provides that: *"This Agreement* will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." (Emphasis added.) This language is essentially the same as the choice-of-law clause construed in *Knieriemen* which provided that " '[t]his contract shall be governed by the laws of the State of New York," ' 427 N.Y.S.2d at 12, a clause found not broad enough to reach tort claims incident to the contractual relationship. The forum-selection clause in the Master Agreement is admittedly broader than the choice-of-law clause; it provides that: "With respect to any suit, action or proceedings *relating to* this Agreement" (emphasis added), the parties submit to the jurisdiction of the federal district courts in New York (given that the choice-of-law clause selected New York law). But no one disputes that the forum-selection clause has been given its full effect-all claims relating to the Master Agreement and Schedule, including LBSF's claim of an extra-contractual setoff right, were heard in the contractually selected forum. The forum-selection and choice-of-law clauses use different language; there is no reason to think that they have the same scope.

Most importantly, LBSF's claimed setoff right does not arise from the contract, so there is no reason that a choice-of-law clause specifying that New York law governs "[t]his Agreement" should also reach LBSF's setoff claim. Setoff claims by definition "aris[e] out of different transactions . . . they are distinguished from recoupment which involves claims arising from the same transaction." *In re Midland Ins. Co.,* 79 N.Y.2d 253, 582 N.Y.S.2d 58, 61, 590 N.E.2d 1186 (1992). The relationship between LBSF's setoff claim, which arises from the bills of exchange, and LBSF's obligation under the derivatives

contracts governed by the Master Agreement, is purely incidental. It so happens that LBSF is asserting Finance One's debt under the bills of exchange to set off LBSF's debt under the derivatives contracts, but LBSF could just as easily have sought to recover under the bills in a completely separate proceeding. In short, LBSF's setoff claim is effectively a permissive counterclaim, and there is no reason to expect the same law to govern both a plaintiff's claim and a defendant's permissive counterclaim. *See Cipa Mfg. Corp. v. Allied Golf Corp.*, No. 94 C 6574, 1995 WL 337022, at *2, 1995 U.S. Dist. LEXIS 7604, at *4–*5 (N.D.Ill. June 1, 1995) ("Because setoff does not destroy the plaintiff's right of action, a claim for setoff is not an affirmative defense. Instead, '[a claim for setoff] embodies a counterdemand based on some transaction entirely extrinsic to the plaintiff's cause of action; and as such it constitutes a defense only in the practical sense that it operates to reduce the remedy-rather than the debt.' As a result, a claim for setoff is properly characterized as a permissive counterclaim .... " (brackets in original, internal citations omitted)).

Of course, if LBSF's setoff right were created by the Master Agreement and Schedule, New York law would govern that right because the choice-of-law clause would reach it. The district court held, however, that the Master Agreement and Schedule create no setoff rights, and LBSF does not challenge this conclusion on appeal. *See Finance One*, 215 F.Supp.2d at 399–400. Moreover, such a challenge would be unsuccessful because, as the district court explained, the reference to setoff rights in paragraph 6(e) of the Master Agreement "is simply a 'placeholder' for any setoff rights that are negotiated in separate schedules or that exist by operation of law." *Id.* at 400 (citing authoritative commentary on the ISDA Master Agreement). The parties did not

negotiate any setoff rights in the Schedule that they executed. Had Finance One and LBSF wished to ensure that New York law would govern the existence and scope of any setoff rights that either party might assert, they could have easily negotiated a clause creating setoff rights in the Schedule. They did not do so. We do not believe that New York courts could stretch the Master Agreement's choice-of-law clause, which requires the parties' "Agreement" to be "governed by and construed in accordance with" New York law, to encompass setoff rights that arise from outside the agreement, given that the parties declined to include within the agreement any provision creating such rights.

### C. Application of New York Choice-of-Law Principles

New York applies separate choice-of-law approaches to contract and to tort claims. In contract cases, New York courts apply "[t]he 'center of gravity' or 'grouping of contacts' choice of law theory ...." *Allstate Ins. Co.*, 597 N.Y.S.2d at 907, 613 N.E.2d 936. By contrast, "the preferred analytical tool in tort cases is to apply 'interest analysis,' where the policies underlying the competing laws are considered." *Id.* at 225, 597 N.Y.S.2d 904, 613 N.E.2d 936. LBSF's putative setoff right, however, is not clearly either a tort claim or a contract claim. Recognizing this, the district court concluded that it "sounds more in public law than in private law"-i.e., it was more like a tort claim than a contract claim-and that therefore "New York courts would resolve this choice of law issue through interest analysis." *Finance One*, 2001 WL 1543820, at *3, 2001 U.S. Dist. LEXIS 19923, at *10. We agree with this conclusion, which neither party disputes.

Interest analysis, adopted by New York in the landmark case of *Babcock v. Jack-*

*son,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), is the bedrock principle that underlies New York's entire choice-of-law regime: "*Babcock* remains the backdrop of New York conflicts jurisprudence ... when specific rules fail to accommodate modern case realities." *Simon,* 124 F.Supp.2d at 62. Thus, when no specific other approach is called for-as it is in contract cases-interest analysis is generally appropriate. Further, disputes over rights in property are subject to interest analysis. Here, the dispute over LBSF's claimed setoff right is arguably a type of property dispute insofar as the parties disagree whether LBSF has a property right that it can assert in this lawsuit to diminish Finance One's recovery. *See In re Istim,* 78 N.Y.2d 342, 575 N.Y.S.2d 796, 798–99, 581 N.E.2d 1042 (1991) (applying interest analysis to determine which jurisdiction's law to apply to dispute over rights in a settlement fund). We therefore agree with the district court that under New York law, we must apply interest analysis to determine whether Thai or New York law governs LBSF's claimed setoff right.

 Interest analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277 (1993) (internal quotation marks omitted). The contacts of the parties and occurrences with each jurisdiction are.thus factors to be considered in applying interest analysis, together with the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts.[5] *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 85, 87 (2d Cir.2002); *Allstate Ins. Co.,* 597 N.Y.S.2d at 907, 613 N.E.2d 936.

 Here the contacts between Thailand and the underlying occurrences are strong, while contacts with New York are virtually nonexistent. The derivatives transactions involved LBSF, a company organized under Delaware law that does business in New York, but virtually all of the negotiations and other activities related to the transactions took place in Thailand, Hong Kong, or Tokyo. The bills of exchange were initially negotiated between two Thai companies (Finance One and LBT), and the only apparent New York contact is that the bills were subsequently assigned to a company that does business in New York (LBSF). The only connec-

---

5. Appellant's counsel appears to attempt to mislead this Court into believing that "contacts and the 'nexus of the events at issue' are irrelevant under the interest analysis test ...." Appellant's Br. at 41. To support this assertion, appellant's counsel offers the following selective quotation from a Second Circuit case: "the law of the jurisdiction having the greatest interest in the litigation will be applied ...." *Id.* (quoting *Wells Fargo Asia Ltd. v. Citibank, N.A.,* 936 F.2d 723, 726 (2d Cir.1991); internal quotation marks omitted). Appellant's counsel appears to deliberately omit the rest of this quotation, which directly contradicts counsel's assertion that "contacts ... are irrelevant" under the interest analysis test. The original language reads in full:

"The rule in New York is that 'the law of the jurisdiction having the greatest interest in the litigation will be applied and that *the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.*' " *Wells Fargo,* 936 F.2d at 726 (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576 (1969)) (emphasis added). Far from being irrelevant, contacts that "relate to the purpose of the particular law in conflict" are essential to interest analysis. Zealous advocacy does not call for this kind of misleading briefing, which, even if not intentionally misleading, disserves the client and tarnishes counsel's credibility.

tion of the parties to New York is that LBSF has its principal place of business in New York. Finance One has no apparent contact with New York other than its relationship with LBSF.

The policies that LBSF contends provide New York with a strong interest in the issues presented by this litigation are:

New York's strong public policy interest in protecting the justified expectations of its citizens by applying New York law to disputes arising out of international finance transactions they enter into with foreign countries, in insuring the stability and predictability of international financial markets, and in maintaining New York's role as the world's leading financial center.

Appellant's Br. at 41 (internal quotation marks omitted). LBSF also points to "New York's deep-rooted public policy in favor of set-off rights and in protecting New York creditors." *Id.* at 44.

The first of these purported interests-protecting justified expectations-simply begs the question. We have already decided that the parties did not agree in the Master Agreement to have New York law govern the existence of a setoff right, and so we must turn somewhere else to determine what the parties were justified in expecting at the inception of their relationship. New York courts have inferred the parties' "justified expectations" from the contacts of the parties and their dispute with New York. *See, e.g., J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 371 N.Y.S.2d 892, 897–99, 333 N.E.2d 168 (1975) (holding that New York law governed where payment was to be rendered in New York and New York was locus of repudiation). LBSF's argument seems to suggest that New York citizens involved in international finance may always justifiably expect New York courts to apply New York law to their disputes with

foreign citizens, regardless of the lack of any specific government interest in, or significant New York contact with, the dispute. New York courts have not gone this far.

The next two New York interests relied on by LBSF are entirely generic, and seem to suggest that New York has a strong governmental interest in having its law apply to any legal dispute that affects the global economy. The cases relied on by LBSF, *J. Zeevi* and *Wells Fargo,* while containing sweeping language referring to New York as the "financial capital of the world," *Wells Fargo,* 936 F.2d at 726; *J. Zeevi,* 371 N.Y.S.2d at 898, 333 N.E.2d 168, concerned breach-of-contract claims where the contracts had significant connections to New York, and relied on the need to respect the parties' "justified expectations" that New York law would apply based on those contacts. Here there are no such significant contacts of the underlying transactions with New York that would lead us to conclude that the parties "justifiably expected" that New York law would apply.

LBSF does articulate one governmental interest of New York that is particularized to the instant dispute-New York's policy of protecting its creditors by assuring them setoff rights. While the strength of this interest is perhaps diminished, as argued by Finance One, by the fact that LBSF only became a creditor by having the rights of Finance One's original creditor, LBT, assigned to it, this remains an interest of New York that we must consider.

Finance One articulates two strong governmental interests of Thailand in Finance One's dispute with LBSF: (1) Thailand's interest in enforcing the orders of its Ministry of Finance and thereby ensuring the stability and well-being of its economy; and (2) its interest in ensuring "equitable treatment and adequate protection for *all*

creditors" of Finance One. Appellee's Br. at 34. LBSF is incorrect in arguing that these interests are illegitimate. First, even if, as LBSF contends, the Ministry's orders do not bar LBSF's setoff rights, Thailand has a strong interest in having the effect of its government's orders determined in accordance with Thai law. Second, LBSF contends that Thailand's interest in ensuring equal treatment of Finance One's creditors is not implicated because Finance One's bankruptcy proceedings did not commence until six months after LBSF claimed its setoff. However, the Ministry of Finance orders suspending and then terminating Finance One's business operations in June and July of 1997 were clearly aimed at protecting Finance One's creditors, among other things, and therefore this interest, which the Special Master identified as springing not from the bankruptcy proceeding but from "the notion of public order or good morals of the Thai people," is implicated to the extent that LBSF's setoff sought an advantage not held by other creditors who were not also debtors to Finance One.

Unlike most of the interests articulated by LBSF, the interests articulated by Finance One are particularized to, and appear to be actually implicated by, the dispute at hand. The Special Master identified them as strong policies of Thailand. Given the minimal contacts of the parties or transactions to New York and the limited identified interests of New York in application of its law, these interests are sufficient to tip the balance of interests in favor of applying Thai law.

## II. Finance One's Reliance on the Master Agreement

 Finance One contends that the Master Agreement expressly prohibits LBSF's setoff because LBSF set its obligation under the Agreement off against

the face value of Thai baht instruments that were in fact valueless, with the result that Finance One did not receive the amount due in U.S. dollars as required by the Agreement. We disagree.

 We review contract interpretation *de novo.* *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 74 (2d Cir.2004). Finance One relies on the following language in the Master Agreement:

8. Contractual Currency

(a) *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement.

In the Schedule the parties adopted U.S. dollars as the generally applicable Contractual Currency in the event of termination payments. Since the language of paragraph 8(a) of the Master Agreement clearly allows LBSF to pay Finance One in the Thai baht equivalent of the U.S. dollar amount owing, Finance One argues that LBSF's payment in the form of discharging Finance One's obligation to pay it under the bills was prohibited because the bills were valueless and it therefore did not "actually receive" payment in the full amount of U.S. currency owing. This is a

creative argument, but this contractual provision appears concerned only with ensuring that currency amounts are converted to their equivalent and does not speak to the form of payment. LBSF paid in the form of discharging a legal obligation of Finance One to pay a debt in Thai baht equivalent to the U.S. dollar amount owed, and the contractual language does not prohibit this. Finance One argues, somewhat disingenuously, that because the bills were valueless in the secondary market it received nothing from LBSF. Finance One received the discharge of its obligation to pay and, despite the fact that the Ministry of Finance orders would have otherwise prevented it from paying the full face value for the time being, absent the discharge LBSF would be entitled to claim in the bankruptcy proceedings and receive, apparently, exactly what the Special Master recommended and the district court awarded–44.4% of the bills' face value.

LBSF argues, and the district court correctly held, *see Finance One,* 215 F.Supp.2d at 400–01, that language in the Schedule even more clearly authorizes LBSF to render its payment in the Thai baht equivalent of the U.S. dollar amount owing, notwithstanding that Finance One did not actually "receive" the correct dollar amount after good faith conversion. Paragraph 1(g) of the Schedule states that:

> "Termination Currency" means USD, except that upon the occurrence of an Event of Default, it means the currency which is a freely available contract currency in respect of at least one current Transaction and selected by the Non-defaulting or the non-Affected party
> ....

Thai baht was a contract currency of a number of the derivatives transactions. Events of Default are defined in paragraph 5(a) of the Master Agreement, and include "bankruptcy," which is defined to include the situation where "[t]he party ... becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due ...." While the relevant language requires as a prerequisite to the Non-defaulting Party's right to select an alternate contract currency only that an Event of Default have "occurred," Finance One argues that because LBSF chose to announce its termination of the derivatives transactions on the ground of "material adverse change," which is defined as a "Termination Event" and not an Event of Default under the Agreement, it may not take advantage of this provision. LBSF's announcement is irrelevant, however, because the Agreement requires only that the Event of Default have "occurred." Therefore, an exception to the general provision specifying U.S. dollars as the Contractual Currency applies, and LBSF was expressly authorized to pay in Thai baht.

## III. Application of Thai Law

We review the district court's interpretation and application of foreign law *de novo. Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,* 29 F.3d 79, 81 (2d Cir.1994). The principal relevant Thai statute is Section 341 of the Thai Civil and Commercial Code, which states in relevant part:

> If two persons are bound to each other by obligations whose subject is of the same kind and both of which are due, either debtor may be discharged from his obligation by setoff to the extent to which the amounts of the obligations correspond, unless the nature of one of the obligations does not admit of it.

Section 342 of the Code provides that "[s]et-off is made by a declaration of intention by one party to the other," which may not be subject to any "condition or time of commencement or ending" and which "re-

lates back in its effect to the time when both obligations could first have been set off." The setoff right is limited by Section 344 of the Code which states that: "A claim against which there is a defence may not be set off." Both parties agree that Section 5 of the Code imposes a requirement that the party claiming setoff, "in the exercise of his rights and in the performance of his obligations, act in good faith." Under Section 6 of the Code there is a rebuttable presumption of good faith.

Finance One challenges the validity of the setoff on five grounds. First, Finance One argues that the Ministry of Finance orders suspending its business created a defense to its payment obligation under the bills of exchange, so that setoff was prohibited under Section 344. Second, Finance One asserts that LBSF acquired the bills from LBT in a sham sale exclusively for the purpose of setting them off against its derivatives obligations, and argues that such conduct constitutes bad faith as a matter of law under Thai law, so that setoff was prohibited under Section 5. Third, Finance One asserts that the transfer of the bills from LBT to LBSF was ineffective due to the fact that the bills were endorsed by the Bangkok Bank at the direction of LBT but in the absence of a written power of attorney, which Finance One claims was a requirement for effective transfer. Finance One asserts that the mutuality required by Section 341 was therefore lacking. Fourth, Finance One argues that LBSF provided legally inadequate notice of its exercise of its setoff right. Fifth, Finance One argues that LBSF's attempt to exercise its setoff right was ineffective due to LBSF's failure to surrender the bills. Finally, Finance One argues in the alternative that even if the setoff was valid, the value LBSF was entitled to set off could in no event be greater than what the district court allowed, because Thai law would not allow a setoff

that would prejudice the rights of Finance One's other similarly situated creditors.

### A. The Right to Setoff

While the Special Master's reports are perhaps not models of clarity, the Master did clearly find that LBSF had a right to set off the value of the bills against its derivatives obligations. Thus, the Master stated that "[t]he Special Master reads [Section 341 of the Thai Civil and Commercial Code] as permission of set-off rights of LBSF in the absence of any declared intention of the parties, disallowing set-off." The Master also clearly rejected Finance One's argument that LBSF exercised its setoff right in bad faith, and implicitly rejected Finance One's various other arguments against the setoff. Because our review is de novo, we are not limited to the Master's findings, nor need we show them any particular deference.

We agree with the Special Master that Section 341 of the Thai Civil and Commercial Code establishes an unambiguous right to set off mutual obligations against one another. We find unconvincing Finance One's argument that the mutuality required by Section 341 was lacking because the bills had not been properly transferred. Finance One relies on Section 798 of the Code as requiring a written power of attorney to make transfer by an agent effective. However, Section 798 requires only that the agent's authority to transfer be evidenced by a writing. Here such evidence exists in the form of a fax from LBT to Bangkok Bank dated June 27, 1997. We also find unconvincing Finance One's argument that LBSF was required to surrender the bills to complete the setoff. We read Section 342 of the Code as rendering setoff effective when declared, with no precondition of surrender. Finance One relies on Section 930 of the Code, but this section requires surren-

der only when a bill of exchange is presented for payment, not when its payment obligation is set off against another obligation. We also find unavailing Finance One's argument that LBSF's notice of setoff was inadequate. LBSF notified Finance One of its election to exercise its setoff right by letter dated July 29, 1997, which identified all of the relevant bills and derivatives transactions. In the absence of any formal requirements for notice of setoff under the Thai Civil and Commercial Code, we believe that this was sufficient to identify the obligations being set off and thus to satisfy Section 342's requirement of a "declaration of intention by one party to the other."

Finance One's most substantial arguments against the setoff are those based on bad faith and the Ministry of Finance orders. The July 25, 1997, order of the Ministry of Finance provides that Finance One shall "not make any repayment under the ... bills of exchange ...." Finance One argues that this language would constitute a defense to enforcement of the bills and therefore renders the setoff invalid under Section 344 of the Thai Civil and Commercial Code. While this language clearly forbade Finance One from voluntarily making payment on any of its outstanding bills of exchange, this preclusion does not necessarily imply that the order would constitute a defense in a civil action seeking payment in a Thai court. None of the Thai legal materials in the record definitively resolves this quandary. Because Finance One bears the burden of establishing its defense to enforcement of the bills, we conclude that the Ministry order does not negate LBSF's right to setoff. We note that this result appears sensible in light of Section 342, which renders setoff a right exercisable unilaterally, with no requirement that the other party consent.

In arguing that LBSF's exercise of its setoff right manifested bad faith as a matter of law, Finance One relies on *Huaykaew Real Estate Co. v. CMIC Finance & Securities Public Ltd.*, Book No. 7085/2542 No. 78 (S. Bangkok Civ.Ct. June 14, 1999), the only Thai case cited by either party in its briefs before this Court. In *Huaykaew* defendant financial company had been suspended from operations by orders issued by the Ministry of Finance on the same dates as the June and July orders suspending Finance One, but had also been placed into liquidation by an order in December 1997. Plaintiff, already in debt to the defendant, became a creditor by acquiring the defendant's debentures subsequent to the liquidation order. Plaintiff claimed that the entirety of its obligation to defendant was extinguished by setting off the debentures against that obligation, and sued to recover the balance due on the debentures. The court held that the setoff was invalid because defendant had a bad faith defense to enforcement of the debentures. The court relied on its

> opinion that the plaintiff has been well aware that the defendant's business operation was suspended temporarily by the [June] order ... and up to the date [of the December order] .... In this regard, the plaintiff should be well aware that the defendant would be no longer to assume its normal business operation and was unable to make profits or repay the payment under the debentures as usual.

From the timing the court inferred that "the plaintiff bought the defendant's debentures with an intention for a setoff ... and ... placing the plaintiff to have an advantage over the defendant's other bona fide creditors and debtors."

LBSF admits that the transfer of the bills from LBT to LBSF was motivated, at least in part, by the desire to create setoff

rights against its derivative obligations to Finance One, and that at the time of transfer it was aware that Finance One had begun defaulting on its debts. This case is, therefore, for the most part, indistinguishable from *Huaykaew.* LBSF attempts to distinguish the cases on the ground that, in *Huaykaew,* liquidation proceedings had begun before the debentures were transferred, but the court in *Huaykaew* relied not on the timing of the liquidation but on the fact that plaintiff was aware that defendant's business had been suspended and that defendant was therefore forbidden to make payment on its debentures. Plaintiff's acquisition of the debentures was therefore taken to be aimed at obtaining unfair advantages over those creditors of the defendant who did not owe it debts against which they could exercise the right of setoff.

The sole significant distinction between the instant case and *Huaykaew* is, rather, that LBSF acquired the bills, at the latest, the day before the suspension of Finance One's business became public knowledge, whereas the bills in *Huaykaew* were acquired with knowledge that a suspension had already occurred. The allegation here is that LBSF should have inferred from the conspicuous financial deterioration of Finance One that its suspension from business was imminent. Were we to follow *Huaykaew* this dispute over LBSF's knowledge of Finance One's condition would merely raise a factual issue for resolution at trial. However, there are factors that render *Huaykaew* of limited persuasive force. First, *Huakyaew* is a trial-court case that we would in no event treat as binding precedent. Furthermore, Thailand is a civil-law jurisdiction where judicial decisions in general are of only persuasive and not binding authority. As noted by the Special Master, even decisions of the Thai Supreme Court are only "highly persuasive," and not "absolutely binding,"

on lower Thai courts. A trial-court case from a jurisdiction that does not recognize the doctrine of precedent is of especially limited persuasive authority. *See American Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.,* 352 F.3d 254, 260–61 (5th Cir. 2003) (noting that when construing law of civil law jurisdiction, even consistent body of intermediate appellate-court decisions may be disregarded in light of persuasive evidence from primary sources of law, including constitution, civil code, and statutes); *Curley,* 153 F.3d at 14 (noting that primary sources of law in civil law jurisdiction are constitution, civil code, and statutes).

In light of the statutory presumption of good faith in Section 6 of the Thai Civil and Commercial Code, we find the Special Master's finding of good faith more persuasive than the reasoning in *Huaykaew.* As noted by the Master, "[t]here was no evidence to show that the purpose of the exercise was to take undue advantage, less to defraud other possible creditors." Finance One failed to meet its burden to present evidence sufficient to rebut the presumption of good faith.

*B. Valuation of the Bills for Purposes of Setoff*

■ Having determined that LBSF was entitled to, and did effectively, exercise its statutory setoff right, the Special Master informed the district court that under Thai law a court would have equitable discretion to value the bills for setoff purposes so as to discount them to the proportion that would have been available in a claim in bankruptcy proceedings, thus preventing inequity among creditors. The Master proposed several methods of valuation aimed at this result, one of which the district court adopted. We review for abuse of discretion a district court's decision to exercise equitable discretion. *See*

*Felton .v. Secretary, U.S. Dep't of Educ.,* 787 F.2d 35, 37 (2d Cir.1986). We hold that the district court abused its discretion when it deferred entirely to the Master's recommendation and failed to conduct an independent analysis of the appropriateness of equitable relief.

 Under common law principles it is well established that equitable discretion may sometimes be exercised to avoid harm to the public interest or unconscionability to a party that would be the consequence of the unflinching application of legal principles.[6] *See, e.g., Grand . Union Co. v. Cord Meyer Dev. Co.,* 761 F.2d 141, 147 (2d Cir.1985) (applying New York law, noting that court has equitable power "to devise whatever remedy it believes in its discretion is necessary to make injured parties whole." (internal quotations marks and ellipsis omitted)); *423 S. Salina St., Inc. v. City of Syracuse,* 68 N.Y.2d 474, 510 N.Y.S.2d 507, 511, 503 N.E.2d 63 (1986) (noting that court has equitable power to grant monetary relief when required "in order to prevent a failure of justice"); *Kaminsky v. Kahn,* 23 A.D.2d 231, 259 N.Y.S.2d 716, 723 (App. Div. 1st Dep't 1965) (noting that court has equitable power to adapt relief to "exigencies of the case"); *London v. Joslovitz,* 279 A.D. 280, 110 N.Y.S.2d 58, 59–60 (App. Div.3d Dep't 1952) (per curiam) ("The power of equity is as broad as equity and justice require . . . ."); *see also SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 456, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940) (stating that a court of equity may deny or impose conditions on relief otherwise available when required by the public. interest).

Here Finance One contends that allowing LBSF to set off the full face value of the bills undermines the strong Thai public policy of ensuring equity among similarly situated creditors and grants LBSF a windfall at the expense of those creditors of Finance One not lucky enough to owe it outstanding debts. This strikes us as a weak showing of entitlement to equitable relief. It must be borne in mind that we have recognized LBSF"s right to set the bills off against its derivative obligations, and have rejected any assertion that it exercised this right in bad faith. Furthermore, we have noted instances in which Thai law appears to treat the right to setoff differently from the right to receive actual payment of an obligation, including the. immediate effectiveness of setoff on unilateral declaration and the lack of a surrender precondition. Given our findings and our reading of Thai law, Finance One has not demonstrated that any Thai public policy is actually implicated by LBSF"s exercise of its setoff right. LBSF is not similarly situated to creditors who are seeking payment as opposed to setoff. There is thus no obvious reason why Thai public policy, as it has been portrayed by the Special Master and the parties, should be offended that LBSF is not treated similarly to such creditors. For the same reason we are not concerned that LBSF is receiving an unconscionable windfall. LBSF is receiving merely what it is entitled to under the bills, and if other creditors do not receive the same thing that is because LBSF is differently situated from other creditors.

We therefore hold, in light of the record, that Finance One has not demonstrated

---

6. Because no evidence has been presented by either party bearing on the standards a Thai court should apply in determining whether to exercise equitable discretion, we apply New York law to this question. *See Curley,* 153

F.3d at 14 ("It is only when no evidence of foreign law has been presented that the courts will decide cases in accordance with New York law.").

345

entitlement to an equitable reduction in LBSF's setoff amount.

## CONCLUSION

For the foregoing reasons, we reverse the judgment entered for plaintiff and remand for entry of judgment for defendant. In light of this disposition, we need not decide whether the district court erred in its calculation of pre- and post-judgment interest.